**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-5354

In the

# United States Court of Appeals
## For the District of Columbia Circuit

RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP, *et al.*,
*Plaintiffs-Appellants,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Defendants-Appellees,*

NATIONAL CATTLEMEN'S BEEF ASSOCIATION, *et al.*,
*Intervenors-Appellees.*

On Appeal from the United States District Court for the District of Columbia

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS**

Alexis Andiman
Peter Lehner
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
aandiman@earthjustice.org
plehner@earthjustice.org
(212) 845-7376

***Additional counsel listed on inside
cover page***

Carrie Apfel
Kara Goad
Earthjustice
1250 I Street NW, 4th Floor
Washington, DC 20005
capfel@earthjustice.org
kgoad@earthjustice.org
(202) 667-4500

*Counsel for Plaintiffs-Appellants
Rural Empowerment Association for
Community Help, Animal Legal
Defense Fund, Center for Biological
Diversity, Center for Food Safety,
Don't Waste Arizona, Environmental
Integrity Project, Food & Water
Watch, Humane World for Animals,
Sierra Club, Sound Rivers, and
Waterkeeper Alliance, Inc.*

Christine Ball-Blakely
Animal Legal Defense Fund
2108 N Street, Suite N
Sacramento, CA 95816
cblakely@aldf.org
(707) 795-2533

*Counsel for Plaintiff-Appellant
Animal Legal Defense Fund*

Tarah Heinzen
Food & Water Watch
1616 P Street NW, Suite 300
Washington, DC 20036
theinzen@fwwatch.org
(202) 683-2500

*Counsel for Plaintiff-Appellant Food
& Water Watch*

2

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.    Parties and Amici.**

Plaintiffs-Appellants are Rural Empowerment Association for Community Help, Animal Legal Defense Fund, Center for Biological Diversity, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food & Water Watch, Humane World for Animals,[1] Sierra Club, Sound Rivers, and Waterkeeper Alliance, Inc.

Defendants-Appellees are the United States Environmental Protection Agency and Lee M. Zeldin, in his official capacity as Administrator of the United States Environmental Protection Agency.

Intervenor-Appellees are National Cattlemen's Beef Association, National Pork Producers Council, American Farm Bureau Federation, and United States Poultry & Egg Association.

No amici appeared before the district court, and no amici have yet appeared before this Court.

**Circuit Rule 26.1 Disclosures**

**Rural Empowerment Association for Community Help**

<u>Non-Governmental Corporate Party to this Action</u>: Rural Empowerment

---

[1] In February 2025, the Humane Society of the United States officially changed its name to Humane World for Animals.

i

Association for Community Help ("REACH")

Parent Corporations: None

Publicly Held Company that Owns 10% or More of Party's Stock: None

Party's General Nature and Purpose: REACH is a nonprofit corporation organized and existing under the laws of North Carolina. REACH aims to educate and empower the citizens of Duplin County, North Carolina, including by working to enforce and improve laws and policies that affect their lives, as well as by helping them to protect themselves from hazardous air pollution generated by industrial animal feeding operations.

**Animal Legal Defense Fund**

Non-Governmental Corporate Party to this Action: Animal Legal Defense Fund ("ALDF")

Parent Corporations: None

Publicly Held Company that Owns 10% or More of Party's Stock: None

Party's General Nature and Purpose: ALDF is a nonprofit corporation organized and existing under the laws of California. ALDF uses the legal system to protect the lives and advance the interests of animals, including by advocating for stronger legal protections against hazardous air pollution from industrial animal feeding operations, which threatens confined animals.

**Center for Biological Diversity**

Non-Governmental Corporate Party to this Action: Center for Biological Diversity ("the Center")

Parent Corporations: None

Publicly Held Company that Owns 10% or More of Party's Stock: None

Party's General Nature and Purpose: The Center is a nonprofit corporation organized and existing under the laws of California, with its headquarters in Tucson, Arizona, and offices throughout the United States. The Center works through science, law, and policy to secure a future for all species hovering on the brink of extinction. In support of its mission, the Center participates in efforts to address threats to imperiled species and public health, including air pollution from industrial animal feeding operations.

**Center for Food Safety**

Non-Governmental Corporate Party to this Action: Center for Food Safety ("CFS")

Parent Corporations: None

Publicly Held Company that Owns 10% or More of Party's Stock: None

Party's General Nature and Purpose: CFS is a nonprofit corporation organized and existing under the laws of California. CFS works to empower people, support farmers, and protect the Earth from the harmful impacts of industrial agriculture, including hazardous air pollution from industrial animal feeding operations.

iii

**Don't Waste Arizona**

<u>Non-Governmental Corporate Party to this Action</u>: Don't Waste Arizona

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Don't Waste Arizona is a nonprofit corporation organized and existing under the laws of Arizona. Don't Waste Arizona advocates for the protection, conservation, and preservation of the human and natural environment across Arizona, including by working to enforce environmental laws pertaining to industrial animal feeding operations.

**Environmental Integrity Project**

<u>Non-Governmental Corporate Party to this Action</u>: Environmental Integrity Project ("EIP")

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: EIP is a nonprofit corporation organized and existing under the laws of the District of Columbia. EIP is dedicated to strengthening environmental laws and improving their enforcement, including environmental laws governing air pollution from industrial animal feeding operations.

iv

**Food & Water Watch**

<u>Non-Governmental Corporate Party to this Action</u>: Food & Water Watch ("FWW")

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: FWW is a nonprofit corporation organized and existing under the laws of the District of Columbia. FWW's mission is to stand up to corporations that put profits before people and advocate for a democracy that improves people's lives and protects our environment, and it does so by advocating for improvements in regulations governing industrial animal feeding operations, among other efforts.

**Humane World for Animals**

<u>Non-Governmental Corporate Party to this Action</u>: Humane World for Animals

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Humane World for Animals is a nonprofit corporation organized and existing under the laws of Delaware. Humane World for Animals advocates for better laws to protect animals and their environment, including laws governing air pollution from industrial animal feeding operations.

**Sierra Club**

Non-Governmental Corporate Party to this Action: Sierra Club

Parent Corporations: None

Publicly Held Company that Owns 10% or More of Party's Stock: None

Party's General Nature and Purpose: Sierra Club is a nonprofit corporation organized and existing under the laws of California. Sierra Club is dedicated to protecting and promoting the enjoyment of the environment, and its goals include preventing air pollution from industrial animal feeding operations from harming public health and rural heritage.

**Sound Rivers**

Non-Governmental Corporate Party to this Action: Sound Rivers

Parent Corporations: None

Publicly Held Company that Owns 10% or More of Party's Stock: None

Party's General Nature and Purpose: Sound Rivers is a nonprofit corporation organized and existing under the laws of North Carolina. Sound Rivers guards the health of the Neuse and Tar-Pimlico River Basins, including by holding industrial animal feeding operations to account for the air pollution that they produce.

**Waterkeeper Alliance, Inc.**

Non-Governmental Corporate Party to this Action: Waterkeeper Alliance, Inc.

Parent Corporations: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Waterkeeper Alliance, Inc. is a nonprofit corporation organized and existing under the laws of New York. Waterkeeper Alliance seeks to restore and protect all major waterways around the world as drinkable, fishable, and swimmable, and it works toward this vision by protecting waterways and communities from air pollution from industrial animal feeding operations, among other efforts.

### B.     Rulings Under Review.

The rulings under review are the opinion and order entered in *Rural Empowerment Association for Community Help v. U.S. Environmental Protection Agency*, No. 18-2260 (TJK) (D.D.C. Aug. 7, 2025), Dkt. Nos. 95 & 96, by the Honorable Timothy J. Kelly on August 7, 2025.  The district court's opinion is not published but is available at 2025 WL 2255085.

### C.     Related Cases.

This case has not previously been before this Court or any court other than the district court, and there are no currently pending related cases.

vii

Dated: April 8, 2026

Respectfully submitted,

Alexis Andiman
Peter Lehner
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
aandiman@earthjustice.org
plehner@earthjustice.org
(212) 845-7376

Carrie Apfel
Kara Goad
Earthjustice
1250 I Street NW, 4th Floor
Washington, DC 20005
capfel@earthjustice.org
kgoad@earthjustice.org
(202) 667-4500

*Counsel for Plaintiffs-Appellants
Rural Empowerment Association for
Community Help, Animal Legal
Defense Fund, Center for Biological
Diversity, Center for Food Safety,
Don't Waste Arizona, Environmental
Integrity Project, Food & Water
Watch, Humane World for Animals,
Sierra Club, Sound Rivers, and
Waterkeeper Alliance, Inc.*

Christine Ball-Blakely
Animal Legal Defense Fund
2108 N Street, Suite N
Sacramento, CA 95816
cblakely@aldf.org
(707) 795-2533

*Counsel for Plaintiff-Appellant
Animal Legal Defense Fund*

viii

ix

Tarah Heinzen
Food & Water Watch
1616 P Street NW, Suite 300
Washington, DC 20036
theinzen@fwwatch.org
(202) 683-2500

*Counsel for Plaintiff-Appellant Food
& Water Watch*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES................ i

TABLE OF CONTENTS ...........................................................................................x

TABLE OF AUTHORITIES.................................................................................. xi

GLOSSARY ...................................................................................................... xvii

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT ........................................................................2

STATEMENT OF ISSUE .......................................................................................3

STATUTES AND REGULATIONS .......................................................................3

STATEMENT OF THE CASE................................................................................3

STANDARD OF REVIEW ...................................................................................12

SUMMARY OF THE ARGUMENT ....................................................................13

STANDING...........................................................................................................15

ARGUMENT ........................................................................................................18

I.   The 2019 Rule Is Inconsistent with a Straightforward Reading of EPCRA's Text, Structure, Purpose, and Legislative History. .......................................19

   A.   The 2019 Rule Conflicts with EPCRA's Text. ......................................20

      1.   "Manner" Describes How Emitting Happens. ........................................21

      2.   Air Emissions from Animal Waste Occur in a Manner Which Would Require Notification Under CERCLA. ....................................................26

   B.   The 2019 Rule Conflicts with EPRCA's Structure and Purpose. ...........30

   C.   The 2019 Rule Conflicts with EPCRA's Legislative History. ................31

II.  The 2019 Rule Conflicts with the FARM Act's Legislative History.............32

CONCLUSION .....................................................................................................35

CERTIFICATE OF COMPLIANCE.....................................................................38

CERTIFICATE OF SERVICE ..............................................................................39

ADDENDUM ...................................................................................................A001

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel. Am. Civ. Constr., LLC v. Hirani Eng'g & Land Surveying, PC,*
26 F.4th 952 (D.C. Cir. 2022)................................................................12

*Brown v. United States,*
602 U.S. 101 (2024).............................................................................22

*Cameron v. Navarre Farmers Union Coop. Ass'n,*
76 F. Supp. 2d 1178 (D. Kan. 1999).....................................................25

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
143 F.4th 518 (D.C. Cir. 2025)............................................................27

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.,*
704 F.3d 413 (5th Cir. 2013) .........................................................7, 17

*Ctr. for Biological Diversity v. EPA,*
56 F.4th 55 (D.C. Cir. 2022)...............................................................15

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.,*
77 F.4th 679 (D.C. Cir. 2023)..............................................................16

*Ctr. for Cmty. Action and Env't Justice v. BNSF Ry. Co.,*
764 F.3d 1019 (9th Cir. 2014) ............................................................28

*In re Fed. Bureau of Prisons' Execution Protocol Cases,*
955 F.3d 106 (D.C. Cir. 2020)............................................................21

*Kalaris v. Donovan,*
697 F.2d 376 (D.C. Cir. 1983).............................................................33

*Leocal v. Ashcroft,*
543 U.S. 1 (2004)................................................................................21

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024).......................................................................18, 23

xi

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)...................................................................................15

*Nat'l Oilseed Processors Ass'n v. Browner*,
 924 F. Supp. 1193 (D.D.C. 1996)..............................................................31

*Nat'l R.R. Passenger Corp. v. Interstate Com. Comm'n*,
 610 F.2d 865 (D.C. Cir. 1979)...................................................................33

*Neighbors for a Toxic Free Cmty. v. Vulcan Materials Co.*,
 964 F. Supp. 1448 (D. Colo. 1997)...................................................8, 18, 31

*Noble v. Nat'l Ass'n of Letter Carriers*,
 103 F.4th 45 (D.C. Cir. 2024).........................................................19, 30, 31

*Pakootas v. Teck Cominco Metals, Ltd.*,
 830 F.3d 975 (9th Cir. 2016) .....................................................................28

*Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*,
 471 F.3d 1350 (D.C. Cir. 2006).......................................................19, 30, 35

*POM Wonderful LLC v. Coca-Cola Co.*,
 573 U.S. 102 (2014)............................................................................30, 32

*Redwing Carriers, Inc. v. Saraland Apartments*,
 94 F.3d 1489 (11th Cir. 1996) ...................................................................25

*Rimini St., Inc. v. Oracle USA, Inc.*,
 586 U.S. 334 (2019)...................................................................................27

*Rural Empowerment Ass'n for Cmty. Help v. EPA*,
 No. 18-2260 (TJK), 2025 WL 2255085 (D.D.C. Aug. 7, 2025) ......12, 15, 18, 21

*Safari Club Int'l v. Zinke*,
 878 F.3d 316 (D.C. Cir. 2017)..............................................................12, 13

*Sec. & Exch. Comm'n v. Chenery Corp.*,
 318 U.S. 80 (1943).....................................................................................19

*Steel Co. v. Citizens for a Better Env't*,
 523 U.S. 83 (1998)...............................................................................14, 30

xii

*TIG Ins. Co. v. Republic of Argentina*,
110 F.4th 221 (D.C. Cir. 2024)..................................................................21

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................................................................................16

*United States v. Gibson Wine Co.*,
No. 1:15-cv-1900-AWI-SKO, 2017 WL 1064658 (E.D. Cal. Mar.
20, 2017) .......................................................................................................8

*United States v. Tropical Fruit, S.E.*,
96 F. Supp. 2d 71 (D.P.R. 2000) ...............................................................25

*Waterkeeper All. v. EPA*,
853 F.3d 527 (D.C. Cir. 2017)......................... 5, 7, 8, 10, 14, 15, 17, 19, 20, 30

**Statutes**

5 U.S.C. § 706......................................................................................................2

5 U.S.C. § 706(2)(A).......................................................................................3, 20

5 U.S.C. § 706(2)(C).......................................................................................3, 20

28 U.S.C. § 1291 .................................................................................................3

28 U.S.C. § 1331 .................................................................................................2

42 U.S.C. § 9601(10) .........................................................................................27

42 U.S.C. § 9601(22) .....................................................................................23, 27

42 U.S.C. § 9603 .................................................................................................8

42 U.S.C. § 9603(a) ...........................................................................................22

42 U.S.C. § 9603(e)(1)(A) .................................................................................24

42 U.S.C. § 9603(e)(1)(B) ...............................................................................9, 26

42 U.S.C. § 9603(e)(2)(B)(i).................................................................................9

42 U.S.C. § 9603(f)(1) .......................................................................................29

42 U.S.C. § 9603(f)(2) .......................................................................................23

42 U.S.C. § 9604(i)(6)(F) ...............................................................................27

42 U.S.C. § 9607(i) .......................................................................................25

42 U.S.C. § 11004 .......................................................................................3, 7

42 U.S.C. § 11004(a)(1) ..................................................................................8

42 U.S.C. § 11004(a)(2) .......................................................................8, 13, 20

42 U.S.C. § 11004(a)(2)(C) ...............................................................19, 21, 26

42 U.S.C. § 11004(a)(3) ..................................................................................8

42 U.S.C. § 11044 ..........................................................................................7

Pub. L. No. 115-141, § 1102, 132 Stat. 348, 1148 (2018)...........................9

**Regulations**

40 C.F.R. § 122.23(b)(1) (2025) ....................................................................3

40 C.F.R. § 302.4(a) (2025) ...........................................................................8

40 C.F.R. § 355 App. A (2025).......................................................................7

40 C.F.R. § 355.32 (2025) ............................................................................23

**Federal Register Publications**

Amendment to Emergency Release Notification Regulations on
    Reporting Exemption for Air Emissions from Animal Waste at
    Farms; Emergency Planning and Community Right-to-Know Act,
    84 Fed. Reg. 27533 (June 13, 2019)
    ....................................................................... 1, 11, 13, 14, 20, 26, 28

CERCLA/EPCRA Administrative Reporting Exemption for Air
    Releases of Hazardous Substances from Animal Waste at Farms,
    73 Fed. Reg. 76948 (Dec. 18, 2008)..........................................................10

Extremely Hazardous Substances List and Threshold Planning
    Quantities; Emergency Planning and Release Notification
    Requirements, 52 Fed. Reg. 13378 (Apr. 22, 1987)..........................23, 24, 26

Notification Requirements; Reportable Quantity Adjustments, 50 Fed. Reg. 13456 (Apr. 4, 1985) ...............................................................................24

Potential Future Regulation for Emergency Release Notification Requirements for Animal Waste Air Emissions Under the Emergency Planning and Community Right-to-Know Act (EPCRA), 88 Fed. Reg. 80222 (Nov. 17, 2023)...............................................5, 31

Reporting Continuous Releases of Hazardous Substances, 55 Fed. Reg. 30166 (July 24, 1990)................................................................................24

**Other Authorities**

115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018), 2018 WL 1443252 ........................................................................................9, 15, 33, 34

132 Cong. Rec. H9561-03 (daily ed. Oct. 8, 1986), 1986 WL 787183.............14, 32

*The Agriculture Creates Real Employment 2 (ACRE) Act: Hearing on S. 2663 Before the S. Comm. on Env't and Pub. Works*, 115th Cong. 50 (2018) .........................................................................................35

*Air Pollution Emissions Overview*, EPA, https://www3.epa.gov/airquality/emissns.html (last updated June 8, 2016) ........................................................................................................27

*CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms*, EPA (last updated Apr. 30, 2018). ..................................................................................11

*CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms*, EPA (last updated Nov. 22, 2017)...................................................................................10

Earthjustice et al., Comment Letter on Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act (Dec. 14, 2018), EPA-HQ-OLEM-2018-0318-0398, https://www.regulations.gov/comment/EPA-HQ-OLEM-2018-0318-0398 ....................................................................................4, 5

*Emission*, *Black's Law Dictionary* (10th ed. 2014)................................................26

xv

EPA, *Emergency Release Notification Requirements for Animal Waste Air Emissions Under the Emergency Planning and Community Right-to-Know Act (EPCRA): Technical Background Document* (2023), https://www.regulations.gov/document/EPA-HQ-OLEM-2023-0142-0003 ...............................................................................4, 5

*The Fair Agricultural Reporting Method Act of the New Regulatory Definition of Waters of the United States: Hearing on S. 2421 Before the Subcomm. on Superfund, Waste Mgmt., and Regul. Oversight of the S. Comm. on Env't and Pub. Works*, 115th Cong. 65 (2018) ...............................................................................34

*Manner*, *Black's Law Dictionary* (5th ed. 1979) ...................................22

*Manner*, *Oxford American Dictionary* (1980), https://archive.org/details/oxfordamericandi0000unse_t4s3/page/n9/mode/2up ...................................................................22

*Occur*, *Black's Law Dictionary* (5th ed. 1979)......................................22

*Response to Comment Document: Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms* (June 2019), EPA-HQ-OLEM-2018-0318-0405, https://www.regulations.gov/document/EPA-HQ-OLEM-2018-0318-0405 ...............................................................................5

Warren A. Braunig, *Reflexive Law Solutions for Factory Farm Pollution*, 80 N.Y.U. L. Rev. 1505 (2005) ..........................................17

xvi

# GLOSSARY

| | |
|---|---|
| AFOs | Animal Feeding Operations |
| APA | Administrative Procedure Act |
| EPA | U.S. Environmental Protection Agency |
| EPCRA | Emergency Planning and Community Right-to-Know Act |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CRS | Congressional Research Service |
| FARM Act | Fair Agricultural Reporting Method Act |
| NEPA | National Environmental Policy Act |
| 2008 Rule | CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms, 73 Fed. Reg. 76948 (Dec. 18, 2008) |
| 2019 Rule | Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act, 84 Fed. Reg. 27533 (June 13, 2019) |

xvii

**INTRODUCTION**

Industrial animal feeding operations ("AFOs") confine hundreds, thousands, or even millions of animals. These animals generate staggering quantities of manure, which emits extremely hazardous ammonia and hydrogen sulfide as it decomposes. Exposure to ammonia and hydrogen sulfide from AFOs can result in death and serious harm. According to the U.S. Environmental Protection Agency ("EPA"), children are disproportionately at risk.

Congress has long recognized that people have a right to know about significant releases of extremely hazardous substances affecting their communities. Accordingly, Congress requires reporting of these releases under the Emergency Planning and Community Right-to-Know Act ("EPCRA"), which includes provisions to make vital health information accessible to the public. EPCRA imposes sweeping reporting requirements with no exception for AFOs, and as this Court has recognized, EPA lacks authority to exempt AFOs unilaterally.

EPA does not dispute that AFO emissions cause grave harm, and it admits that AFOs large enough to trigger EPCRA's reporting requirements could relatively easily come into compliance. Nonetheless, EPA has repeatedly taken action to excuse AFOs from their congressionally mandated reporting obligations under EPCRA. Shortly after this Court vacated a prior unlawful exemption, EPA issued the exemption rule at issue here. *See* Amendment to Emergency Release

(Page 20 of Total)

Notification Regulations on Reporting Exemption for Air Emissions from Animal

Waste at Farms; Emergency Planning and Community Right-to-Know Act, 84 Fed.

Reg. 27533 (June 13, 2019) ("2019 Rule").  In so doing, EPA relied on a new law

known as the FARM Act, which eliminated AFOs' obligation to notify authorities

of hazardous emissions under a different law—the Comprehensive Environmental

Response, Compensation, and Liability Act ("CERCLA")—even though

lawmakers took care to emphasize that the FARM Act would have no effect on

EPCRA.  As explained below, this Court should vacate the 2019 Rule, because it is

inconsistent with a straightforward reading of EPCRA's text, structure, purpose,

and legislative history, and it conflicts with the FARM Act's legislative history.

## JURISDICTIONAL STATEMENT

This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C.

§ 706, and, accordingly the district court had jurisdiction pursuant to 28 U.S.C.

§ 1331, which provides for jurisdiction in district courts for civil actions arising

under the laws of the United States.  On August 7, 2025, the district court entered a

final order and judgment that disposed of all claims in the case.  *See* Order, Aug. 7,

2025, Dkt. No. 95.  The Plaintiffs-Appellants Rural Empowerment Association for

Community Help, Animal Legal Defense Fund, Center for Biological Diversity,

Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project,

Food & Water Watch, Humane World for Animals, Sierra Club, Sound Rivers, and

2

Waterkeeper Alliance, Inc. ("Environmental and Community Groups") filed a timely notice of appeal on October 6, 2025. *See* Notice of Appeal, Oct. 3, 2025, Dkt. No. 97 [JA___]. This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which provides for jurisdiction in courts of appeals for review of all final decisions of the district courts of the United States.

## STATEMENT OF ISSUE

Whether the 2019 Rule violates EPCRA, 42 U.S.C. § 11004, and is not in accordance with law and is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of the APA, 5 U.S.C. § 706(2)(A), (C), because it contravenes EPCRA's text, structure, purpose, and legislative history; misconstrues the relationship between EPCRA and CERCLA; and undermines Congress's intent to require that AFOs report their emissions of extremely hazardous substances under EPCRA.

## STATUTES AND REGULATIONS

Pursuant to Federal Rule of Appellate Procedure 28(f), the pertinent statutory and regulatory provisions are included in an addendum.

## STATEMENT OF THE CASE

**The largest AFOs are major emitters of extremely hazardous ammonia and hydrogen sulfide pollution.**

AFOs are industrial facilities that confine hundreds, thousands, or even millions of animals to produce meat, dairy, or eggs. *See* 40 C.F.R. § 122.23(b)(1)

3

(2025). Together, these animals generate a tremendous amount of manure, which releases extremely hazardous ammonia and hydrogen sulfide as it decomposes. Earthjustice et al., Comment Letter on Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act, at 8 (Dec. 14, 2018), EPA-HQ-OLEM-2018-0318-0398, https://www.regulations.gov/comment/EPA-HQ-OLEM-2018-0318-0398 [JA___] ("Earthjustice Comments"). Although all AFOs generate some ammonia and hydrogen sulfide, the largest operations are the most significant emitters. Indeed, EPA estimates that just three percent of all U.S. farms, including AFOs, emit 100 pounds or more of ammonia or hydrogen sulfide each day, meaning that only three percent of farms would be required to report their emissions under EPCRA. EPA, *Emergency Release Notification Requirements for Animal Waste Air Emissions Under the Emergency Planning and Community Right-to-Know Act (EPCRA): Technical Background Document* 12 (2023), https://www.regulations.gov/document/EPA-HQ-OLEM-2023-0142-0003 [JA___]. For example, EPA estimates that a broiler facility—that is, a facility that confines chickens for meat production—must confine more than 151,057 birds to emit 100 pounds of ammonia per day. *Id.* at 10 tbl. 2-2 [JA___]. Not only does EPA estimate that a small percentage of operations would be required to report their emissions under EPCRA, but the agency also estimates that

4

reporting would impose relatively minor costs on those operations.  EPA admits that a large AFO could come into compliance with EPCRA's reporting requirements with an initial investment of 10 hours and $443.  *See id.* at 16–22, 24 [JA___].

Human exposure to ammonia and hydrogen sulfide emissions from AFOs causes serious and even potentially fatal health problems, including decreased lung function, scarring of the respiratory tract, headaches, and nausea, as well as impairments to balance, vision, hearing, memory, mood, and intellectual function. Earthjustice Comments at 9 [JA___]; *see Waterkeeper All. v. EPA*, 853 F.3d 527, 536 (D.C. Cir. 2017) (recognizing that "people have become seriously ill and even died" due to exposure to AFO pollution).  EPA has recognized that "populations located in close proximity to animal operations are at a greater risk for adverse health effects," and "people of color, low-income individuals, and children" are disproportionately harmed.  Potential Future Regulation for Emergency Release Notification Requirements for Animal Waste Air Emissions Under the Emergency Planning and Community Right-to-Know Act (EPCRA), 88 Fed. Reg. 80222, 80227 (Nov. 17, 2023).  Nonetheless, EPA expressly declined to consider the "health or environmental effects" of AFO air pollution when it developed the 2019 Rule.  EPA, *Response to Comment Document: Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal*

*Waste at Farms* 18 (June 2019), EPA-HQ-OLEM-2018-0318-0405,

https://www.regulations.gov/document/EPA-HQ-OLEM-2018-0318-0405 [JA___].

The Environmental and Community Groups' members have experienced a variety of health harms from exposure to AFO ammonia and hydrogen sulfide emissions, including burning airways,[2] exacerbated allergies,[3] intense nausea,[4] "itchy eyes, runny noses, and sore throats."[5]  In addition, these emissions greatly reduce members' quality of life, forcing nearby residents to retreat indoors,[6] keep windows and doors closed,[7] and give up "some of the most cherished aspects of rural life, like gardening, drying clothes on a line, hosting cookouts, and spending time outdoors."[8]

---

[2] Decl. of Max Wilson ¶ 7 (sworn to on Aug. 27, 2024) ("Wilson Decl.").

[3] Decl. of Cynthia Parke ¶ 3 (sworn to on Dec. 17, 2021) ("Parke Decl.").

[4] Wilson Decl. ¶ 7; *see also* Decl. of Judy Jolin ¶ 13 (sworn to on Aug. 20, 2024) ("Jolin Decl."); Decl. of Devon Hall ¶ 10 (sworn to on Aug. 26, 2024) ("Hall Decl.").

[5] Decl. of Rosemary Partridge ¶ 5 (sworn to on Aug. 22, 2024) ("Partridge Decl."); *see also* Jolin Decl. ¶13; Hall Decl. ¶ 10.

[6] Wilson Decl. ¶ 8; *see also* Decl. of Candice Cook ¶ 10 (sworn to on Dec. 20, 2021).

[7] Parke Decl. ¶ 5.

[8] Hall Decl. ¶ 8; *see also* Partridge Decl. ¶ 9; Wilson Decl. ¶ 8; Decl. of Curtis Ramer ¶ 12 (sworn to on Dec. 20, 2021); Jolin Decl. ¶ 17.

6

**EPCRA requires AFOs to report certain ammonia and hydrogen sulfide emissions to state, tribal, and local authorities, including emergency responders, and it makes information from the reports available to the public.**

EPCRA mandates that any facility that releases more than a threshold quantity of an "extremely hazardous substance," including ammonia or hydrogen sulfide, must notify state, tribal, and local authorities, who must then make that information available to the public. *See* 42 U.S.C. §§ 11004, 11044; 40 C.F.R. § 355 App. A (2025) (listing ammonia and hydrogen sulfide as "extremely hazardous substances" that trigger EPCRA notification requirements if released in excess of 100 pounds per day). In this way, EPCRA ensures that "vital health information [is] available in one easily accessible place," providing an "obvious advantage" to people at risk. *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 430 (5th Cir. 2013); *see also Waterkeeper All.*, 853 F.3d at 537 (concluding that members of the public, including first responders and people living nearby, derive "real benefits" from accessing information about AFO pollution under EPCRA). EPCRA includes no exemption for AFOs, and EPA may not unilaterally create one. *See Waterkeeper All.*, 853 F.3d at 535.

EPCRA's notification requirements build upon similar, preexisting notification provisions set out in CERCLA, commonly known as Superfund. CERCLA requires facilities to alert federal authorities upon releasing more than a threshold quantity of a "hazardous substance," including ammonia or hydrogen

7

sulfide.  *See* 42 U.S.C. § 9603; 40 C.F.R. § 302.4(a) (2025) (listing ammonia and hydrogen sulfide as hazardous substances).  Two of EPCRA's reporting requirements apply when a release requires notification under CERCLA.  *See* 42 U.S.C. § 11004(a)(1), (a)(3).  And one of EPCRA's reporting requirements—at issue here—applies even if the release does not require notification under CERCLA, so long as certain conditions are met.  *See id.* § 11004(a)(2).  Together, EPCRA's reporting requirements create a "sweeping reporting mandate." *Waterkeeper All.*, 853 F.3d at 535.

Although EPCRA and CERCLA both require reporting of releases, the statutes serve "entirely different purpose[s]." *Neighbors for a Toxic Free Cmty. v. Vulcan Materials Co.*, 964 F. Supp. 1448, 1452 (D. Colo. 1997).  Unlike EPCRA, CERCLA does not include a public-disclosure provision.  *See Waterkeeper All.*, 853 F.3d at 530 ("EPCRA . . . has a public-disclosure requirement that's missing from the relevant CERCLA provisions.").  Thus, CERCLA aims to facilitate cleanup, while "EPCRA's purpose goes beyond cleanup—it seeks to ensure public access to health-related information." *United States v. Gibson Wine Co.*, No. 1:15-cv-1900-AWI-SKO, 2017 WL 1064658, at *10 (E.D. Cal. Mar. 20, 2017); *see also Neighbors for a Toxic Free Cmty.*, 964 F. Supp. at 1452 (explaining that EPCRA ensures "that the community at the local level is prepared and knowledgeable" about hazardous releases).

8

In March 2018, Congress enacted the FARM Act, which amended CERCLA to eliminate reporting requirements under CERCLA for "air emissions from animal waste (including decomposing animal waste) at a farm."[9]  42 U.S.C. § 9603(e)(1)(B); *see* Pub. L. No. 115-141, § 1102, 132 Stat. 348, 1148 (2018).  The FARM Act did not amend EPCRA and "did not change reporting requirements for releases of extremely hazardous substances under EPCRA."  115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018), 2018 WL 1443252 (statement of FARM Act co-sponsor Sen. Tom Carper).  The FARM Act thus balances Congress's desire to excuse AFO operators from CERCLA reporting requirements with its understanding that AFOs had been "successfully reporting [their] releases to their State emergency response commissions and to their local emergency planning committees," as EPCRA requires, since 2009.  *Id.*

**EPA has repeatedly attempted to exempt AFOs from EPCRA's reporting requirements, in contravention of EPCRA.**

EPA has repeatedly attempted to exempt AFOs from their congressionally mandated duty to report releases of ammonia and hydrogen sulfide under EPCRA. In 2008, EPA finalized a rule that excused all AFOs from reporting under CERCLA and excused all but the largest AFOs from reporting under EPCRA.  *See*

---

[9] AFOs fall within CERCLA's definition of a "farm," because they are a "site or area" that "is used for . . . the raising or selling of animals (including any form of livestock, poultry, or fish)."  42 U.S.C. § 9603(e)(2)(B)(i).

9

CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms, 73 Fed. Reg. 76948 (Dec. 18, 2008) ("2008 Rule").  EPA concluded that CERCLA reporting was unnecessary because it was unlikely that EPA would respond to releases from AFOs, *id.* at 76956, but it retained EPCRA reporting for the largest AFOs in recognition of "comments expressing a concern that air emissions of hazardous substances from animal waste at the largest animal feeding operations may pose a risk and therefore State and local governments and the public should continue to receive reports of such emissions," *id.* at 76953.  A coalition of community and environmental organizations, including several appellants in this action, petitioned the D.C. Circuit for review, alleging that the 2008 Rule violated CERCLA and EPCRA.  *See* Pet. for Rev., *Waterkeeper All.*, 853 F.3d 527 (D.C. Cir. 2009) (No. 09-1017). After years of EPA-driven delay, the D.C. Circuit vacated the 2008 Rule in 2017, concluding that EPA lacked authority to create exemptions to EPCRA's reporting requirements.  *See Waterkeeper All.*, 853 F.3d at 537–38.

Shortly thereafter, EPA published new guidance purporting to exempt all "farms," including AFOs, from EPCRA reporting, asserting that Congress did not intend to require "farms engaged in routine agricultural operations" to report their emissions.  *CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms*, EPA (last updated Nov. 22,

10

2017) [JA___].  After Congress passed the FARM Act, EPA revised the guidance to reflect the new theory that AFO emissions no longer trigger the requirement to report under EPCRA because of the FARM Act's exemption for air emissions from animal waste under CERCLA.  *See CERCLA and EPCRA Reporting Requirements for Air Releases of Hazardous Substances from Animal Waste at Farms*, EPA (last updated Apr. 30, 2018) [JA___].

In September 2018, the Environmental and Community Groups initiated the action that gave rise to this appeal.  *See* Compl., Sep. 28, 2018, Dkt. No. 1 [JA___].  EPA then issued the 2019 Rule, which codifies the revised guidance exempting AFOs from EPCRA reporting.  *See* 2019 Rule.  The Environmental and Community Groups amended their complaint to challenge the 2019 Rule.  *See* First Am. Compl., July 9, 2019, Dkt. No. 29 [JA___].  Several industry groups then intervened to defend the 2019 Rule.  *See* Order, Aug. 3, 2021.

In August 2024, the Environmental and Community Groups moved for summary judgment, arguing that the 2019 Rule conflicts with EPCRA and that EPA failed to comply with the APA or the National Environmental Policy Act ("NEPA") in the rulemaking process.  *See* Mem. of Law in Supp. of Pls.' Mot. for Summ. J., Aug. 27, 2024, Dkt. No. 83-1.  EPA and the industry intervenors cross-moved for summary judgment.  *See* Defs.' Cross Mot. for Summ. J., Sep. 24, 2024, Dkt. No. 87; Intervenor-Defs.' Cross Mot. for Summ. J., Oct. 8, 2024, Dkt. No. 90.

11

The district court denied the Environmental and Community Groups' motion and granted both EPA's motion and the industry intervenors' motion, concluding that the FARM Act's exemption from CERCLA reporting for air emissions from animal waste means that such releases do not trigger EPCRA's reporting requirements. *Rural Empowerment Ass'n for Cmty. Help v. EPA*, No. 18-2260 (TJK), 2025 WL 2255085, at *10 (D.D.C. Aug. 7, 2025). In addition, the district court held that because air emissions from animal waste no longer trigger EPCRA's reporting requirements, EPA complied with the APA and NEPA when it issued the 2019 Rule. *Id.*

## STANDARD OF REVIEW

This Court "reviews *de novo* the district court's denial of summary judgment and its statutory interpretation." *United States ex rel. Am. Civ. Constr., LLC v. Hirani Eng'g & Land Surveying, PC*, 26 F.4th 952, 956 (D.C. Cir. 2022). Where the district court has reviewed an agency action under the APA, the Court reviews that action directly, according "no particular deference" to the district court's judgment. *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017) (quoting *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002)). The APA requires the Court to "'hold unlawful and set aside agency action' that is . . . 'not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). "The APA also provides that a reviewing court shall 'hold unlawful and set aside agency action,

12

findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'"  *Id*. (quoting 5 U.S.C. § 706(2)).

**SUMMARY OF THE ARGUMENT**

At the heart of this appeal is EPCRA's requirement that facilities report any release of an extremely hazardous substance, even if that release "is not subject to the notification requirements . . . of CERCLA," so long as the release "occurs in a manner which would require notification under . . . CERCLA" and satisfies certain other conditions not in dispute here.  42 U.S.C. § 11004(a)(2).  The 2019 Rule rests on EPA's erroneous conclusion that air emissions from animal waste do not require reporting under EPCRA because "the FARM Act exempted these types of releases from CERCLA reporting," and therefore, these emissions "no longer 'occur[] in a manner' that would require notification under CERCLA."  *See* 2019 Rule at 27535. But EPA's conclusion conflicts with EPCRA's text, structure, purpose, and legislative history, as well as the legislative history of the FARM Act.

A straightforward, contextual reading of EPCRA reveals that "manner" describes the way a release occurs, and under this reading, air emissions from animal waste continue to occur in a manner which would require notification under CERCLA.  As EPA admits, air emissions from animal waste are releases under EPCRA and CERCLA because "they are 'emitting' or 'escaping' under the

13

statutory definitions." *Id.* at 27539–40. Nothing in the FARM Act's "animal waste" exemption indicates that this particular "emitting" or "escaping" happens in a unique way that would not require notification under CERCLA. Accordingly, air emissions from animal waste occur in a manner which would require notification under CERCLA and, thus, continue to trigger EPCRA's reporting requirements.

This reading aligns with EPCRA's structure, purpose, and legislative history. EPCRA's reporting requirements create a "sweeping reporting mandate," *Waterkeeper All.*, 853 F.3d at 535, in service of the statute's goal of "inform[ing] the public about the presence of hazardous and toxic chemicals" and "provid[ing] for emergency response in the event of [a] health-threatening release." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86 (1998). And a "principal architect[]" of EPCRA expressly instructed that "the reporting requirements should be construed to allow the public the broadest possible access to toxic chemical information in formats that are straightforward and easy to understand." 132 Cong. Rec. H9561-03 (daily ed. Oct. 8, 1986), 1986 WL 787183 (statement of Rep. Robert Edgar).

The FARM Act's legislative history confirms the Environmental and Community Groups' reading. A co-sponsor of the FARM Act emphasized that he had "worked hard" with the other co-sponsors "to ensure that, at the same time [they] exempted farms from hazardous substance reporting requirements under . . . CERCLA, [they] chose to make *no changes* to how extremely hazardous

14

substances should be reported under EPCRA." 115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018) (emphasis added). For all these reasons, the Environmental and Community Groups' reading of EPCRA squares that statute's text, structure, purpose, and legislative history with the FARM Act and its legislative history, while EPA's reading conflicts with EPCRA's text, structure, purpose, and legislative history and with the FARM Act's legislative history.

## STANDING

An organization may sue on behalf of its members when (1) at least one member of the organization has standing to sue in their own right, (2) the interests the organization seeks to protect are germane to its purpose, and (3) neither the asserted claim nor the requested relief requires individual members to participate in the litigation. *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022). An organization's member has standing to sue in their own right if they suffer an injury in fact that is (1) actual or imminent, (2) fairly traceable to the agency's challenged action, and (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

As the district court correctly held, "standing is no impediment to addressing [the Environmental and Community Groups'] claims." *Rural Empowerment Ass'n for Cmty. Help*, 2025 WL 2255085, at *4 n.6; *see also Waterkeeper All.*, 853 F.3d at 534 (holding that nonprofit organizations, including several appellants here, had

15

standing to challenge the 2008 Rule). The Environmental and Community Groups are nonprofit organizations that work to protect human health and the environment, including by raising awareness of AFO pollution and reducing that pollution, and many of their members live, work, or recreate near AFOs. As discussed below, the organizations have members who have standing to sue in their own right, and protecting their members' interest in obtaining information about AFO emissions is germane to the organizations' work to protect human health and the environment.

The Environmental and Community Groups' members have standing to sue in their own right because the 2019 Rule inflicts an informational injury. A party suffers an informational injury when "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023) (quoting *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017)); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (requiring a party to identify "downstream consequences" caused by the denial of information).

The 2019 Rule deprives the organizations' members of vital information about AFO emissions, which EPCRA requires AFOs to disclose, and this

16

deprivation causes serious downstream consequences. Without information about AFO emissions, the organizations' members are left exposed to extremely hazardous pollutants that harm their health. The 2019 Rule prevents members from taking steps to avoid or minimize exposure when emissions are at their worst,[10] such as by closing their windows or leaving the area.[11] In addition, the groups' members cannot accurately inform their doctors about exposures, which prevents them from making fully informed decisions about their health.[12] Nor can they "share . . . information with [their] community, so that everyone would have a better chance of staying healthy,"[13] or effectively advocate for limits on AFO ammonia and hydrogen sulfide emissions.[14]

These are precisely the harms that EPCRA was meant to guard against. *See Ctr. for Biological Diversity, Inc.*, 704 F.3d at 429 (holding that members' inability

---

[10] This includes, for example, when AFOs agitate their manure pits, a process during which ammonia and hydrogen sulfide "are rapidly released from the manure and may reach toxic levels or displace oxygen, increasing the risk to humans and livestock." *Waterkeeper All.*, 853 F.3d at 536 (quoting 73 Fed. Reg. at 76957).

[11] The 2019 Rule also makes it less likely that AFOs will reduce their ammonia and hydrogen sulfide emissions, prolonging the groups' members' exposure to the emissions. Reporting requirements have been shown to motivate polluters to reduce their emissions. *See* Decl. of Abel Russ ¶ 7 (sworn to on Aug. 23, 2024); *see also* Warren A. Braunig, *Reflexive Law Solutions for Factory Farm Pollution*, 80 N.Y.U. L. Rev. 1505, 1523–24 (2005). But "[a]s long as [AFOs] can keep their emissions a secret from community members and government regulators, these facilities have no incentive to clean up." Hall Decl. ¶ 17.

[12] Jolin Decl. ¶ 23.

[13] Hall Decl. ¶ 16.

[14] Partridge Decl. ¶ 19.

17

to assess the possible health effects of their exposure to extremely hazardous substances is "the kind of concrete informational injury that [EPCRA] was designed to redress"); *see also Neighbors for a Toxic Free Cmty.*, 964 F. Supp. at 1452 (explaining that EPCRA ensures "that the community at the local level is prepared and knowledgeable" about hazardous releases). These harms also are directly traceable to the 2019 Rule and would be redressed by restoring AFOs' EPCRA reporting obligations. For these reasons, the Environmental and Community Groups have standing to bring this challenge.[15]

### ARGUMENT

"Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024). This Court "begin[s] with the text," which "must be read in the

---

[15] Before the district court, EPA raised only a passing challenge to the standing of two of the Environmental and Community Groups, contending that Sound Rivers and Waterkeeper Alliance "allege[d] injury based purely on presumed decreases in water quality, which the Rule does not affect." Defs.' Cross Mot. for Summ. J. 6 n.2, Sep. 24, 2024, Dkt No. 87. But declarants for both organizations explain that the 2019 Rule deprives them of information to which they are entitled under EPCRA, and this deprivation prevents them from understanding and addressing water pollution and other harms from AFO emissions. *See* Decl. of Heather Deck ¶ 13 (sworn to on Aug. 23, 2024); Decl. of Daniel E. Estrin ¶ 14 (sworn to on July 26, 2024); Decl. of Rebecca Jim ¶ 13 (sworn to on July 27, 2024). In any event, as the district court correctly concluded, "[i]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits." *Rural Empowerment Ass'n for Cmty. Help*, 2025 WL 2255085, at *4 n.6 (quoting *Noel Canning v. NLRB*, 705 F.3d 490, 514 (D.C. Cir. 2013)).

context of the entire statute." *Noble v. Nat'l Ass'n of Letter Carriers*, 103 F.4th 45, 50 (D.C. Cir. 2024) (citation omitted). "After examining the plain text, [the Court] move[s] on to the statute's structure, purpose, and legislative history." *Id.* Where, as here, an agency rule hinges on statutory interpretation, the Court will declare the rule invalid if the agency "wrongly 'believes that [its] interpretation is compelled by Congress.'" *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004)); *see also Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (explaining that "an [agency] order may not stand if the agency has misconceived the law"). As this Court has explained, EPA lacks authority to create exemptions where Congress has imposed a "sweeping reporting mandate," as it has done under EPCRA. *Waterkeeper All.*, 853 F.3d at 535.

## I.     The 2019 Rule Is Inconsistent with a Straightforward Reading of EPCRA's Text, Structure, Purpose, and Legislative History.

As explained below, EPCRA requires reporting of certain releases that "occur[] in a manner which would require notification under . . . CERCLA," even if those releases are not subject to CERCLA's notification requirements. 42 U.S.C. § 11004(a)(2)(C). A straightforward reading of EPCRA makes clear that "manner," in the context of § 11004(a)(2)(C), describes how a release happens. For decades, EPA has advanced an interpretation of "manner" consistent with this straightforward reading.

Here, EPCRA's text compels the conclusion that air emissions from animal waste continue to occur in a manner that would require notification under CERCLA, even though Congress exempted those emissions from CERCLA's notification requirements.  To reach the opposite conclusion in the 2019 Rule, EPA misinterprets EPCRA's text and disregards EPCRA's structure, purpose, and legislative history.  For these reasons, the 2019 Rule is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, [and] short of statutory right." 5 U.S.C. § 706(2)(A), (C).  Accordingly, this Court must hold the 2019 Rule to be unlawful and set it aside.

## A. The 2019 Rule Conflicts with EPCRA's Text.

EPCRA expressly requires facilities to report any release of an extremely hazardous substance, *even if* that release "is not subject to the notification requirements . . . of CERCLA," provided that the release satisfies three conditions:

(A)  [it] is not a federally permitted release as defined in . . . CERCLA,

(B)  [it] is in an amount in excess of a quantity which . . . requires notice, and

(C)  [it] occurs in a manner which would require notice under section 103(a) of CERCLA.

42 U.S.C. § 11004(a)(2).  EPA admits that AFO emissions satisfy the first two criteria because these emissions "are generally not federally permitted and may exceed the applicable reportable quantity."  2019 Rule at 27535; *see Waterkeeper All.*, 853 F.3d at 536 (characterizing as "truly an understatement" EPA's admission

20

that various practices at AFOs "may cause emissions to exceed reportable quantities" (citation omitted)).  Thus, the only issue in dispute is whether AFO emissions "occur[] in a *manner* which would require notification under section 103(a) of CERCLA."  42 U.S.C. § 11004(a)(2)(C) (emphasis added).  As the district court correctly concluded, "[i]f these emissions occur in such a manner, then reporting is required, and the 2019 Rule contravenes EPCRA."  *Rural Empowerment Ass'n for Cmty. Help*, 2025 WL 2255085, at *5.

### 1.  "Manner" Describes How Emitting Happens.

To determine whether air emissions from animal waste "occur[] in a manner which would require notification under section 103(a) of CERCLA," it is necessary to "assess the [statutory] words in the context in which they are used." *TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221, 231 (D.C. Cir. 2024).  Context is especially important here, because "manner" is a "broad, flexible term" that "cannot be interpreted in isolation."  *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 129 (D.C. Cir. 2020) (Rao, J., concurring); *see id.* at 123 (Katsas, J., concurring) (cautioning that "manner" could be misinterpreted if "[d]ivorced" from context); *see also Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (explaining that courts "construe [statutory] language in its context and in light of the terms surrounding it," "[p]articularly" when the statute in question includes an "elastic" term).

21

Read in a vacuum, "manner" could have multiple meanings, including "the way a thing is done or happens," "a person's bearing or way of behaving toward others," "kind [or] sort," and "style in literature or art." *Manner*, *Oxford American Dictionary* 404 (1980), https://archive.org/details/oxfordamericandi0000unse_t4s3/page/n9/mode/2up; *see also Manner*, *Black's Law Dictionary* (5th ed. 1979) (defining "manner" to mean a "way, mode, method of doing anything, or mode of proceeding in any case or situation"). In the context of § 11004(a)(2)(C), however, this universe of potential meanings is reduced. Because § 11004(a)(2)(C) concerns a release that "occurs in a [certain] manner," only one definition of "manner" fits: "the way a thing is done or happens." Therefore, "manner" in this context must describe the way a release occurs—or, in other words, how the release happens. *See Occur*, *Black's Law Dictionary* (5th ed. 1979) (defining "occur" to include "to happen").

The meaning of "manner" in the context of § 11004(a)(2)(C) is further refined by that provision's reference to "section 103(a) of CERCLA," which sets out CERCLA's notification requirements for "any release." 42 U.S.C. § 9603(a); *see Brown v. United States*, 602 U.S. 101, 116 (2024) (explaining that "a reference to another statute by specific title or section number . . . in effect cuts and pastes the referenced statute" (citation modified)). Subject to certain exclusions, CERCLA defines "release" to encompass a wide range of actions—that is, "any

22

spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."  42 U.S.C. § 9601(22).  Combining this definition of "release" with the meaning of "manner" discussed above, it follows that § 11004(a)(2)(C) asks whether a particular instance of "emitting," for example, happens in a way which would require notification under CERCLA.

Historically, EPA has acted in accordance with this straightforward, contextual reading, consistently interpreting "manner" to describe how a release happens.  *See Loper Bright Enters.*, 603 U.S. at 386 (explaining that "the longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is" (citation modified)).  For instance, CERCLA exempts from immediate notification requirements "any release of a hazardous substance . . . which is a continuous release, stable in quantity and rate," provided certain conditions are met.  42 U.S.C. § 9603(f)(2).  Shortly after EPCRA was enacted, EPA "clarifie[d]" that "continuous releases" need not be reported under EPCRA "[b]ecause such releases do not 'occur in a manner' which requires immediate release reporting under . . . CERCLA."[16]  Extremely Hazardous Substances List and Threshold Planning Quantities; Emergency Planning and

---

[16] EPCRA's implementing regulations impose certain "reduced reporting requirements" for continuous releases.  *See* 40 C.F.R. § 355.32 (2025).

Release Notification Requirements, 52 Fed. Reg. 13378, 13384 (Apr. 22, 1987); *see also* Reporting Continuous Releases of Hazardous Substances, 55 Fed. Reg. 30166, 30179 (July 24, 1990) (asserting that, "[t]o the extent that releases are continuous and stable in quantity and rate as defined by CERCLA section 103(f)(2) . . . , they do not occur in a manner that requires notification under CERCLA section 103(a)"). EPA expressly distinguished "continuous releases" from "episodic release[s]" and, in so doing, acknowledged that episodic releases are "precisely the type of release[s] intended to be reported under" EPCRA. 52 Fed. Reg. at 13384. In addition, EPA explained that so-called "baseline conditions under normal operations"—that is, predictable releases from certain facilities—are exempt from reporting under EPCRA "*only if* [those releases are] 'continuous' or 'federally permitted.'" *Id*. (emphasis added). EPA's longstanding interpretation of "continuous releases" thus hinges on how those releases happen—that is, continuously, not episodically.

To the extent EPA maintains that "the application of a [registered] pesticide product" need not be reported under EPCRA because it does not occur in a manner that requires notification under CERCLA, that interpretation too is consistent with a straightforward, contextual reading of "manner." 42 U.S.C. § 9603(e)(1)(A). EPA has long understood the availability of the pesticide notification exemption to depend on how pesticides are applied. *See* Notification Requirements; Reportable

24

Quantity Adjustments, 50 Fed. Reg. 13456, 13464 (Apr. 4, 1985) ("The legislative history of CERCLA suggests that Congress intended that the pesticide exemption apply to the application of a pesticide generally in accordance with its purpose."). And courts construing CERCLA's liability exemption for "the application of a [registered] pesticide," *see* 42 U.S.C. § 9607(i), have similarly concluded that the exemption is available only for pesticides "applied . . . in a customary manner." *Cameron v. Navarre Farmers Union Coop. Ass'n*, 76 F. Supp. 2d 1178, 1182 (D. Kan. 1999); *see also Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1511 n.31 (11th Cir. 1996) (affirming a district court's finding that a defendant cannot be held liable for the alleged disposal of pesticides where the plaintiff failed to produce any evidence refuting the defendant's proof that the pesticides were "properly applied"); *United States v. Tropical Fruit, S.E.*, 96 F. Supp. 2d 71, 90 (D.P.R. 2000) (concluding that the defendant was not afforded protection under CERCLA's pesticide liability exemption, because the defendant applied pesticides not "in the customary manner" but, instead, "in a manner which allowed" the pesticides to drift onto adjacent properties "in contravention of . . . labeling requirements" (citation omitted)).  EPA's interpretation of the pesticide notification exemption therefore accords with a straightforward reading of EPCRA's text, reinforcing the conclusion that "manner," as used in § 11004(a)(2)(C), describes how a release happens.

### 2. Air Emissions from Animal Waste Occur in a Manner Which Would Require Notification Under CERCLA.

Applying a straightforward reading of "manner" consistent with EPCRA's text—that is, interpreting "manner" to describe how emitting happens—makes clear that air emissions from animal waste continue to "occur[] in a manner which would require notification under . . . CERCLA," 42 U.S.C. § 11004(a)(2)(C), even though those emissions are now exempt from CERCLA's notification requirements, *see id.* § 9603(e)(1)(B). As EPA admits, "emissions into the air from animal waste at farms . . . qualify as releases into the environment under both [EPCRA and CERCLA]," because "they are 'emitting' or 'escaping' under the statutory definitions." 2019 Rule at 27539–40. Nothing in the "animal waste" exemption indicates that this particular "emitting" (or "escaping") happens in a unique way that would not require notification under CERCLA. To the contrary, the "animal waste" exemption identifies "baseline conditions under normal operations" at certain farms, which according to EPA's longstanding interpretation, must be reported under EPCRA unless they are "federally permitted" or properly established as "continuous," which AFO emissions are not. 52 Fed. Reg. at 13384.

The phrase "air emissions," as opposed to "emissions," cannot be understood to identify a unique way of "emitting" because emissions affect the air by definition. *See Emission*, *Black's Law Dictionary* (10th ed. 2014) (defining "emission," in relevant part, as "[a] pollutant that is released *into the air*"

(emphasis added)); *see also Air Pollution Emissions Overview*, EPA, https://www3.epa.gov/airquality/emissns.html (last updated June 8, 2016) (explaining that "[e]missions is the term used to describe the gases and particles which are put *into the air* or emitted by various sources" (emphasis added)).  In drafting CERCLA, Congress did not distinguish between "emissions," "air emissions," and "emissions into the air."  *See, e.g.*, 42 U.S.C. § 9601(10) (defining "federally permitted release," within the meaning of CERCLA, to include certain "emission[s] into the air" subject to regulation under the Clean Air Act); *id.* § 9601(22) (excluding various "emissions from . . . engine exhaust" from CERCLA's definition of "release"); *id.* § 9604(i)(6)(F) (including "air emissions" among the "potential pathways of human exposure" relevant to health assessments conducted under CERCLA).  And courts have cautioned against reading too much significance into such drafting decisions.  *See Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019) (recognizing that "[r]edundancy is not a silver bullet" because "[s]ometimes the better overall reading of the statute contains some redundancy"); *cf. Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 534 (D.C. Cir. 2025) ("Context counts, and it is sometimes difficult to read much into the absence of a word that is present elsewhere in a statute." (citation omitted)).  In fact, "air" and "emissions" are so closely correlated that courts have refused to find an intent to regulate air pollution where the relevant statutory

27

provision does not include "emitting" among prohibited acts. *See Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975, 984 (9th Cir. 2016) (reversing a district court's refusal to strike or dismiss claims alleging that the aerial emission of hazardous substances constituted "disposal" under CERCLA because CERCLA's definition of "disposal" does not include "emitting"); *Ctr. for Cmty. Action and Env't Justice v. BNSF Ry. Co.*, 764 F.3d 1019, 1024 (9th Cir. 2014) (finding that the emission of air pollution does not constitute "disposal," where the relevant "definition of 'disposal' does not include the act of 'emitting'"). It makes no sense to conclude that Congress intended to identify a unique way of emitting through its use of the phrase "air emissions" here, given that Congress and courts have previously understood "emissions" to be equivalent to "air emissions."

Neither does the phrase "from animal waste" identify a unique way of emitting. Instead, as EPA appears to acknowledge, this phrase identifies a category of substances—that is, "*any substance* [emitted] from animal waste at a farm." 2019 Rule at 27535 (emphasis added). EPA dismisses this reading because the exemption does not name "specific substances typically associated with animal waste (such as ammonia and hydrogen sulfide)." *Id*. But, of course, there is no requirement that Congress name each substance to which an exemption applies. Congress similarly exempted from CERCLA notification the category of hazardous substances subject to certain reporting requirements under the Solid Waste

28

Disposal Act, without naming each such substance. *See* 42 U.S.C. § 9603(f)(1) (exempting from CERCLA's notification requirements "any release of a hazardous substance . . . which is required to be reported (or specifically exempted from a requirement for reporting) under subtitle C of the Solid Waste Disposal Act or regulations thereunder and which has been reported to the National Response Center"). And, here, naming ammonia and hydrogen sulfide could have had the undesirable effect of complicating requirements for farmers, who might reasonably wonder whether they were obligated to monitor and, potentially, report emissions of any hazardous or extremely hazardous substances *other than* ammonia and hydrogen sulfide, including any substance that might be classified as "hazardous" or "extremely hazardous" at some point in the future.

* * *

In the context of § 11004(a)(2)(C), "manner" describes the way a release occurs—here, how emitting happens. Nothing in the "animal waste" exemption indicates that "air emissions from animal waste" happen in a unique way that would not require notification under CERCLA. To reach the opposite conclusion, EPA and the district court misinterpreted EPCRA's text, erroneously reading "air emissions" and "from animal waste" to specify a unique way of emitting, which is incorrect for the reasons above. Because EPA "wrongly believes" that the interpretation of EPCRA set out in the 2019 Rule "is compelled by Congress," this

29

Court must declare the 2019 Rule to be invalid. *Peter Pan Bus Lines, Inc.*, 471 F.3d at 1354 (citation modified).

### B. The 2019 Rule Conflicts with EPRCA's Structure and Purpose.

EPCRA's structure and purpose confirm the Environmental and Community Groups' straightforward reading of the statute's text. *See Noble*, 103 F.4th at 51. As this Court has explained, EPCRA's requirements together mandate "sweeping reporting." *Waterkeeper All.*, 853 F.3d at 535. This sweeping reporting structure supports the statute's purpose, which is to "inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of [a] health-threatening release." *Steel Co.*, 523 U.S. at 86. Reading EPCRA to require reporting of extremely hazardous AFO emissions, consistent with EPCRA's text, comports with the statute's structure and advances its public-disclosure purpose.

In excusing AFOs from their EPCRA reporting obligations, the 2019 Rule disregards EPCRA's sweeping reporting structure and the congressional design underlying the distinct purposes of EPCRA and CERCLA. Where two statutes touch on the same subject but serve different purposes, it "show[s] disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 115–16 (2014) (holding that the Food, Drug, and Cosmetic Act

30

does not preclude claims under the Lanham Act in light of the "congressional design to enact two different statutes, each with its own mechanisms to enhance the protection of competitors and consumers").

As discussed above, Congress constructed EPCRA around the "central premise" that "[s]tate and local governments, as well as the public at large, are entitled to access information concerning potential chemical hazards in their communities." *Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1197 (D.D.C. 1996); *see also* 88 Fed. Reg. at 80225 (acknowledging that, "[a]s stated in the title of the statute, EPCRA . . . has an important community right-to-know component"). By contrast, Congress designed CERCLA to facilitate federal efforts to clean up hazardous substances, without a public-disclosure component. *See Neighbors for a Toxic Free Cmty.*, 964 F. Supp. at 1452. In concluding that the FARM Act's exemption from CERCLA reporting for air emissions from animal waste precludes EPCRA reporting, EPA disregards Congress's carefully crafted design of EPCRA and CERCLA.

### C. The 2019 Rule Conflicts with EPCRA's Legislative History.

Because EPCRA's text, structure, and purpose are clear, this Court need not look to the legislative history. *See Noble*, 103 F.4th at 50. However, EPCRA's legislative history lends additional support to the Environmental and Community Groups' straightforward reading of the statute. In a debate on EPCRA shortly

31

before it was passed, one of the statute's "principal architects" emphasized

EPCRA's purpose and urged that the statute should be broadly construed to

advance that purpose.  Representative Robert Edgar explained:

> A second major principle of this program is to make information regarding toxic chemical exposure available to the public, particularly to the local communities most affected.  For too long, the public has been left in the dark about its exposure to toxic chemicals.  Information that has been available under existing environmental statutes, such as the Clean Water Act or the Clean Air Act, has been difficult to aggregate and interpret, which has made it difficult, if not impossible, for the public to gain an overall understanding of their toxic chemical exposure.  Consequently, *the reporting requirements should be construed to allow the public the broadest possible access to toxic chemical information* in formats that are straightforward and easy to understand.

132 Cong. Rec. H9561-03 (daily ed. Oct. 8, 1986) (emphasis added) (statement of

Rep. Robert Edgar).  Interpreting EPCRA to exempt AFO ammonia and hydrogen

sulfide emissions from the statute's reporting requirements thus "would not only

ignore the distinct functional aspects of [EPCRA] and [CERCLA] but also would

lead to a result that Congress likely did not intend."  *POM Wonderful LLC*, 573

U.S. at 116.

## II.    The 2019 Rule Conflicts with the FARM Act's Legislative History.

EPCRA's text, structure, purpose, and legislative history make clear that the

"animal waste" exemption does not excuse AFOs from reporting their ammonia

and hydrogen sulfide emissions.  But even if EPCRA were unclear (and it is not),

the FARM Act's legislative history leaves no doubt that AFOs remain obligated to

32

report their emissions under EPCRA.  And the FARM Act's legislative history can aid this Court's interpretation of EPCRA because "[l]egislative history of subsequent legislation is entitled to significant weight in construing earlier, related legislation."  *Kalaris v. Donovan*, 697 F.2d 376, 392 n.65 (D.C. Cir. 1983); *see also Nat'l R.R. Passenger Corp. v. Interstate Com. Comm'n*, 610 F.2d 865, 873 (D.C. Cir. 1979) (explaining that "[i]t is a well established principle that courts may look to subsequent legislation as an aid in the interpretation of prior legislation dealing with the same or similar subject matter" (quoting *Jordan v. DOJ*, 591 F.2d 753, 770 (D.C. Cir. 1978))).

During the FARM Act's floor debate, FARM Act co-sponsor Senator Tom Carper made clear that he and the other co-sponsors had carefully drafted the law so that it would not trigger an exemption from EPCRA.  *See* 115 Cong. Rec. S1925 (daily ed. Mar. 22, 2018).  Senator Carper emphasized that he had "worked hard" with the FARM Act's other co-sponsors "to ensure that, at the same time [they] exempted farms from hazardous substance reporting requirements under . . . CERCLA, [they] chose to make *no changes* to how extremely hazardous substances should be reported under EPCRA."  *Id.* (emphasis added); *see also id.* (explaining that the Senate version of the bill that became the FARM Act exempted most farms from reporting "air emissions from animal waste" under CERCLA but "[left] intact reporting requirements under [EPCRA]").  In other words, the FARM

33

Act's co-sponsors were well aware of the interaction between CERCLA and EPCRA, and they purposefully wrote the FARM Act's CERCLA exemption so that it does not give rise to an EPCRA exemption.

The Congressional Research Service ("CRS"), an industry representative, and a state regulator shared the FARM Act co-sponsors' understanding that the law would not create an exemption from EPCRA. A CRS memorandum prepared specifically to analyze the FARM Act's effect on EPCRA and presented during the floor debate concluded that if the FARM Act were enacted, "the applicability of [EPCRA] . . . would remain the same as in current law." *Id.* The CRS memorandum also explained that, as the Environmental and Community Groups discuss above, "EPA has treated the phrase 'occurs in a manner' in EPCRA Section 304(a)(2)(C) to mean the nature of the release in terms of how a substance enters the environment." *Id.*

CRS was not alone in concluding that the FARM Act would not affect reporting under EPCRA. In a hearing on the FARM Act before the Senate Committee on Environment and Public Works, the Executive Director of Delmarva Poultry Industry, Inc. agreed that the FARM Act "would not impact [EPCRA's] Community Right-to-Know requirement." *The Fair Agricultural Reporting Method Act of the New Regulatory Definition of Waters of the United States: Hearing on S. 2421 Before the Subcomm. on Superfund, Waste Mgmt., and Regul.*

34

*Oversight of the S. Comm. on Env't and Pub. Works*, 115th Cong. 65 (2018) (statement of Bill Satterfield).  And in a second hearing before the same committee, the Director of the Wyoming Department of Agriculture acknowledged that AFOs "would still have a duty to report under EPCRA."  *The Agriculture Creates Real Employment (ACRE) Act: Hearing on S. 2663 Before the S. Comm. on Env't and Pub. Works*, 115th Cong. 50 (2018) (statement of Doug Miyamoto).

Thus, by the time Congress voted on the FARM Act, it was aware of the widely held view that the law would not exempt any AFO releases from EPCRA reporting.  If Congress had intended for the FARM Act to exempt AFO emissions from EPCRA, it would have modified the FARM Act's language to achieve that outcome.  But Congress did nothing of the sort, so we must conclude that it intended the FARM Act to have no effect on EPCRA reporting.  As a result, there can be no doubt that EPA "wrongly believes that [its] interpretation is compelled by Congress."  *Peter Pan Bus Lines, Inc.*, 471 F.3d at 1354 (citation modified) (quoting *PDK Labs., Inc.*, 362 F.3d at 798).

## CONCLUSION

AFOs emit extremely hazardous ammonia and hydrogen sulfide at levels that can cause serious injury or death.  Congress enacted EPCRA to ensure that people affected by dangerous releases of extremely hazardous substances have the broadest possible access to information about those releases.  Decades later,

35

Congress took care to preserve this access to information under EPCRA for people living near AFOs, even as it excused AFO operators from CERCLA's notification requirements through the FARM Act.  EPA's 2019 Rule upsets the careful balance that Congress struck, and it contravenes EPCRA's text, structure, purpose, and legislative history, as well as the legislative history of the FARM Act.  For the reasons above, the Environmental and Community Groups respectfully request that this Court vacate the 2019 Rule.

Dated: April 8, 2026                            Respectfully submitted,

*/s/ Alexis Andiman*
Alexis Andiman
Peter Lehner
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
aandiman@earthjustice.org
plehner@earthjustice.org
(212) 845-7376

Carrie Apfel
Kara Goad
Earthjustice
1250 I Street NW, 4th Floor
Washington, DC 20005
capfel@earthjustice.org
kgoad@earthjustice.org
(202) 667-4500

*Counsel for Plaintiffs-Appellants*
*Rural Empowerment Association for*
*Community Help, Animal Legal*

36

*Defense Fund, Center for Biological Diversity, Center for Food Safety, Don't Waste Arizona, Environmental Integrity Project, Food & Water Watch, Humane World for Animals, Sierra Club, Sound Rivers, and Waterkeeper Alliance, Inc.*

Christine Ball-Blakely
Animal Legal Defense Fund
2108 N Street, Suite N
Sacramento, CA 95816
cblakely@aldf.org
(707) 795-2533

*Counsel for Plaintiff-Appellant Animal Legal Defense Fund*

Tarah Heinzen
Food & Water Watch
1616 P Street NW, Suite 300
Washington, DC 20036
theinzen@fwwatch.org
(202) 683-2500

*Counsel for Plaintiff-Appellant Food & Water Watch*

37

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 28(a)(10), I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 8,303 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) as it has been prepared in Microsoft Word 365 using 14-point Times New Roman typeface and is double-spaced (except for headings, footnotes, and block quotations).

Dated: April 8, 2026

/s/ Alexis Andiman

Alexis Andiman

38

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of April, 2026, I electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via the CM/ECF System the foregoing Appellants' Brief. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Alexis Andiman*

Alexis Andiman

39