# NOT YET SCHEDULED FOR ORAL ARGUMENT

## No. 25-5354

## In the United States Court of Appeals for the District of Columbia Circuit

Rural Empowerment Association for Community Help, *et al.*,

*Plaintiffs-Appellants,*

v.

United States Environmental Protection Agency, *et al.*,

*Defendants-Appellees,*

National Cattlemen's Beef Association, *et al.*,

*Intervenors-Appellees.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 18-cv-2260-TJK
Hon. Timothy J. Kelly

## Brief of Amici Curiae State of Utah and 24 Other States in Support of Intervenors-Appellees and Affirmance

Derek Brown
*Utah Attorney General*

Stanford Purser
*Solicitor General*

Mark C. Gillespie
*Assistant Solicitor General*

Office of the
Utah Attorney General
160 East 300 South, 5th Floor
P.O. Box 140858
Salt Lake City, UT 84114-0858
(385) 867-8016

*Counsel for Amicus Curiae State of Utah*
(additional counsel listed after signature page)

# Table of Contents

Table of Authorities....................................................................................ii

Certificate as to Parties, Rulings, and Related Cases...........................vi

Glossary ................................................................................................viii

Introduction and Interests of Amici Curiae ...........................................1

Summary of the Argument ......................................................................3

Argument.................................................................................................5

I.    Agriculture is a crucial state interest and a cornerstone of state economics....................................................................................5

II.   Agriculture flourishes when states retain the power to regulate their own farmers and ranchers—as Congress has recognized. ...11

      A.    States are the primary regulators of agriculture. ................11

      B.    Congressional regulation of agriculture encourages cooperative federalism, not federal fiat. ...............................13

III.  The district court's interpretation of EPCRA is correct, beneficial, and consistent with longstanding federalism principles. ...............................................................................20

Conclusion .............................................................................................25

Additional Counsel................................................................................27

Certificate of Compliance......................................................................29

# Table of Authorities

**Federal Cases**

*Atl. Richfield Co. v. Christian,*
590 U.S. 1 (2020).................................................................. 15, 16

*Burlington N. & Santa Fe Ry. Co. v. United States,*
556 U.S. 599 (2009)............................................................. 14, 15

*Church of Holy Trinity v. United States,*
143 U.S. 457 (1892)....................................................................25

*CTS Corp. v. Waldburger,*
573 U.S. 1 (2014).......................................................................15

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.,*
608 U.S. ___, No. 24-345, 2026 WL 1686059 (U.S. June 11, 2026) .....25

*Gregory v. Ashcroft,*
501 U.S. 452 (1991).....................................................................3

*Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.,*
471 U.S. 707 (1985)....................................................................12

*Hüls Am. Inc. v. Browner,*
83 F.3d 445 (D.C. Cir. 1996).......................................................20, 23

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996)....................................................................12

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.,*
596 F.3d 112 (2d Cir. 2010) .........................................................16

*Pelfresne v. Vill. of Williams Bay,*
865 F.2d 877 (7th Cir. 1989)........................................................11

*Rural Empowerment Ass'n for Cmty. Help v. EPA,*
No. 18-2260, 2025 WL 2255085 (D.D.C. Aug. 7, 2025) .......................22

*Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*,
735 F.3d 131 (3d Cir. 2013) ...............................................................16

*United States v. Balsys*,
524 U.S. 666 (1998) ..........................................................................14

*United States v. Butler*,
297 U.S. 1 (1936) ..............................................................................14

*United States v. Pub. Util. Comm'n of California*,
345 U.S. 295 (1953) ..........................................................................25

*Waterkeeper All. v. EPA*,
853 F.3d 527 (D.C. Cir. 2017) ......................................... 17, 18, 22, 24

**Federal Statutes**

42 U.S.C. § 11004(a) ..............................................................................21

42 U.S.C. § 11004(a)(2)(C) ...............................................................21, 22

42 U.S.C. § 11004(b)(1) ..........................................................................24

42 U.S.C. § 9601 .....................................................................................14

42 U.S.C. § 9603(a) ............................................................................15, 16

42 U.S.C. § 9603(e) ...........................................................................21, 22

42 U.S.C. § 9603(e)(1)(B) ........................................................................18

42 U.S.C. § 9605(h) .................................................................................15

42 U.S.C. § 9621(d)(2)(A)(ii) ...................................................................15

42 U.S.C. § 9621(f)(1) .............................................................................16

**State Statutes**

California Food & Agric. Code § 101 .......................................................10

Florida Stat. § 570.01 .............................................................................10

Tex. Agric. Code § 1.001 ............................................................ 10

Utah Code § 19-1-104 ................................................................ 8

Utah Code § 4-17-103 ................................................................ 8

Utah Code § 4-2-102(2) .............................................................. 8

Utah Code § 4-3-301 .................................................................. 8

**Federal Regulations**

73 Fed. Reg. 76948 (Dec. 18, 2008) ....................................... 17

83 Fed. Reg. 56791 (Nov. 14, 2018) .................................. 21, 22

84 Fed. Reg. 27533 (June 13, 2019) .................................. 21, 23

**Other Authorities**

*2025 State Agriculture Overview:
California*, USDA Nat'l Agric. Stat. Serv. ............................... 9

*2025 State Agriculture Overview:
Florida*, USDA Nat'l Agric. Stat. Serv. ................................. 10

*2025 State Agriculture Overview:
Texas*, USDA Nat'l Agric. Stat. Serv. .................................... 10

*2025 State Agriculture Overview:
Utah*, USDA Nat'l Agric. Stat. Serv. ........................................ 7

Caroline Hargraves & Juliette Tennert, *Utah's Agriculture Economy*,
Univ. of Utah Kem C. Gardner Pol. Inst. (Jan. 2025) ..................... 8, 9

Eric Albers, *A Portrait of Agriculture in Utah,* Univ. of Utah Kem C.
Gardner Pol. Inst. (Dec. 2025) ............................................ 8

Erik Dohlman & William Chambers *et al.*, *USDA Agricultural
Projections to 2035*, USDA Econ. Rsch. Serv. (Feb. 13, 2026) .............. 7

Jim Chen, *Of Agriculture's First Disobedience and Its Fruit,*
48 Vand. L. Rev. 1261 (1995) .............................................. 12

Kathleen Kassel, *Agriculture and Its Related Industries Provide 10.4 Percent of U.S. Employment*,
USDA Econ. Rsch. Serv. (Nov. 3, 2023) .................................................6

Legis. Hearing on S. 2421, The Fair Agric. Reporting Method Act,
115th Cong. (2018).................................................................... 18, 19

Letter from Thomas Jefferson to John Jay (Aug. 23, 1785).....................1

Paul S. Taylor, *Public Policy and the Shaping of Rural Society*,
20 S.D.L. Rev. 475 (1975) .....................................................13

Proclamation No. 10532, 88 Fed. Reg. 17363 (Mar. 20, 2023) .................1

Proclamation No. 11019, 91 Fed. Reg. 15507 (Mar. 24, 2026) .................1

Reginald Holland, Aditya R. Khanal & Purushottam Dhungana,
*Agritourism as an Alternative On-Farm Enterprise for Small U.S. Farms: Examining Factors Influencing the Agritourism Decisions of Small Farms*, 14 Sustainability 4055 (Mar. 29, 2022) .........................6

Steve Zahniser, *What Is Agriculture's Share of the Overall U.S. Economy?*, USDA Econ. Rsch. Serv. (Dec. 19, 2024) ............................6

The Federalist No. 17 (Alexander Hamilton)
(Clinton Rossiter ed., 1961) ...............................................................12

The Federalist No. 34 (Alexander Hamilton)
(Clinton Rossiter ed., 1961) ...............................................................19

## Certificate as to Parties, Rulings, and Related Cases

### A. Parties, Intervenors, and Amici

Except for the following, all parties, intervenors, and amici appearing in this Court are listed in the Opening Brief of Plaintiffs-Appellants and the Brief of Intervenors-Appellees:

*Amici***:** The States of Utah, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, New Mexico, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, West Virginia, and Wyoming.

### B. Rulings Under Review

The district court rulings under review are listed in the Opening Brief of Plaintiffs-Appellants.

### C. Related Cases

This case has not previously been before this Court or any court other than the district court, and there are no currently pending related cases.

<u>*/s/ Mark C. Gillespie*</u>
Mark C. Gillespie
*Assistant Utah Solicitor General*

*Counsel for Amicus Curiae*
*State of Utah*

# Glossary

| | |
|---|---|
| 2008 Rule | CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms, 73 Fed. Reg. 76948 (Dec. 18, 2008) |
| 2019 Rule | Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act, 84 Fed. Reg. 27,533 (June 13, 2019) |
| Amici States | The States of Utah, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, New Mexico, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, West Virginia, and Wyoming |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| EPA | U.S. Environmental Protection Agency |
| EPCRA | Emergency Planning and Community Right-to-Know Act |
| FARM Act | Fair Agricultural Reporting Method Act |
| GDP | Gross Domestic Product |

**Introduction and Interests of Amici Curiae**

One of America's greatest strengths has always been its agriculture. Even before the Constitution was drafted, Thomas Jefferson praised "[c]ultivators of the earth" as the country's "most valuable citizens." Letter from Thomas Jefferson to John Jay (Aug. 23, 1785).[1] And nearly two and a half centuries later, after industrial, technological, and economic revolutions, presidential administrations spanning the political spectrum still recognize the importance of the "farmers, farmworkers, ranchers, fishers, [and] foresters" who "feed our Nation, fuel our prosperity, and sustain our glorious way of life." Proclamation No. 10532, 88 Fed. Reg. 17363–64 (Mar. 20, 2023) (President Joseph R. Biden, Jr.); Proclamation No. 11019, 91 Fed. Reg. 15507–08 (Mar. 24, 2026) (President Donald J. Trump). The agricultural industry has never been more essential to American health, security, and prosperity.

Nor has the role of the states in regulating that industry ever been more vital. States have been the primary regulators of agriculture since

---

[1] https://avalon.law.yale.edu/18th_century/let32.asp.

the country's beginning, and they continue to oversee farming within their borders today. Every state presents different circumstances to farmers and ranchers—climate, soil, topography, population, transportation, to name just a few. While the federal government's power to regulate interstate commerce does affect agriculture nationwide, states each build on that regulatory foundation in different and often creative ways. The resulting patchwork of state agricultural economies (and state agricultural laws) represents one of the most vibrant experiments currently running in the nation's famous laboratories of democracy.

The States of Utah, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, New Mexico, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, West Virginia, and Wyoming (Amici States) share this interest, and submit this brief in support of Intervenors-Appellees. This case involves a dispute over whether a federal statute—the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA)—requires farmers to report emissions from livestock, despite a recent congressional effort to remove

similar requirements in a related statute. In holding that EPCRA does not, the district court honored Congress's efforts to ease federal regulatory burdens on agricultural workers. Its interpretation of EPCRA is consistent with both the statutory text and the constitutional "system of dual sovereignty between the States and the Federal Government" that "every schoolchild learns." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). This Court should affirm.

## SUMMARY OF THE ARGUMENT

**I.** Agriculture is an area of particular state concern. Each year, farming, ranching, and related industries contribute over $1 trillion to the national gross domestic product (GDP). And in individual states, the effect is sometimes even more pronounced. Utah, for instance, devotes more than 10 million acres of land to agricultural pursuits, produces hundreds of millions of dollars in agricultural products annually, and regulates farming and ranching through detailed regulations. And states across the country, both urban and rural, follow the same pattern. Food production is one of the most important activities subject to state regulation.

**II.** The state interest in agriculture dates back to the dawn of the Republic. The Constitution left states as the primary regulators of agriculture, in large part because each state has a unique blend of geography, climate, population, and natural resources to work with. States diverged immediately in their methods of regulating agriculture, and they continue to experiment as science and technology change the shape of American farming. The best agricultural policy depends largely on where the policy is implemented; what may work for a dry, cool, sparsely populated state may not do much to help farmers in a warm, humid, urban locale.

Congress is most successful in directing national agricultural policy when it recognizes states as the agricultural regulators. Two statutes related to this case, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and the Fair Agricultural Reporting Method Act of 2018 (FARM Act), prove the point. CERCLA was conceived as an exercise in cooperative federalism, where federal and state officials work together—with state and local officials often taking precedence when conflicts arise—to achieve the shared goal of environmental protection. And the FARM Act was an

affirmative effort by Congress to reduce federal reporting burdens on farmers. Statutes like these promote effective governance by favoring flexible state governance over a one-size-fits-all federal mandate.

**III.** The statute before the Court in this case, EPCRA, similarly avoids imposing rigid federal oversight. EPCRA includes a notice requirement based explicitly on CERCLA's similar reporting mandate. The parties agree that aerial releases of animal waste products do not trigger CERCLA notice obligations, and the district court correctly concluded that they do not trigger a reporting duty under EPCRA either. That interpretation is consistent not only with the text of both statutes, but also with the principles of cooperative federalism that have guided Congress's agricultural enactments to date. The Court should affirm the judgment below.

## ARGUMENT

## I. Agriculture is a crucial state interest and a cornerstone of state economics.

Agriculture is one of the most important industries in the United States. The numbers are staggering. Agriculture-related industries contributed $1.055 trillion to the United States GDP and "created 19.7 million full- and part-time jobs" in 2020, and those numbers are

growing. Reginald Holland, Aditya R. Khanal & Purushottam Dhungana, *Agritourism as an Alternative On-Farm Enterprise for Small U.S. Farms: Examining Factors Influencing the Agritourism Decisions of Small Farms*, 14 Sustainability 4055 (Mar. 29, 2022).[2] In 2022, the agricultural and food industries accounted for 22.1 million jobs—10.4% of total U.S. employment. Kathleen Kassel, *Agriculture and Its Related Industries Provide 10.4 Percent of U.S. Employment*, USDA Econ. Rsch. Serv. (Nov. 3, 2023).[3] In 2023, "agriculture, food, and related industries contributed roughly $1.537 trillion to U.S. gross domestic product," accounting for 5.5% of the total GDP. Steve Zahniser, *What Is Agriculture's Share of the Overall U.S. Economy?*, USDA Econ. Rsch. Serv. (Dec. 19, 2024).[4] And the U.S. Department of Agriculture (USDA) anticipates that the need for American agricultural products will continue to grow over the next decade both at home and abroad, as domestic demand rises and "agricultural exports are projected to steadily increase at an average annual rate of 1.7 percent."

---

[2] https://doi.org/10.3390/su14074055.

[3] https://www.ers.usda.gov/data-products/chart-gallery/58282.

[4] https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/ag-and-food-sectors-and-the-economy.

Erik Dohlman & William Chambers *et al.*, *USDA Agricultural Projections to 2035*, USDA Econ. Rsch. Serv. (Feb. 13, 2026).[5]

These statistics are impressive, but unsurprising. They merely restate in the language of economists a fact that every living person already knows: everyone has to eat.

States understand this, too. Farming and ranching are critical pillars that support the physical and economic wellbeing of their citizens. Utah provides a ready example. A recent survey recorded 17,200 farm operations across 10.5 million acres of Utah land. *2025 State Agriculture Overview: Utah*, USDA Nat'l Agric. Stat. Serv. (last accessed June 19, 2026).[6] Those farm operations together accounted for over a million heads of livestock and produced over 2.25 billion pounds of milk. *Id.* Animal products aside, last year Utah farms also produced roughly 5.6 million bushels of corn, 5 million bushels of wheat, 740,000 bushels of barley, 6.8 million pounds of safflower, and 32 million pounds of cherries. *Id.* The market value of these products is substantial,

---

[5] https://www.ers.usda.gov/publications/113816.
[6] https://www.nass.usda.gov/Quick_Stats/Ag_Overview/stateOverview.php?state=Utah.

totaling billions of dollars ($2.3 billion in 2022) and including over $360 million in estimated international exports. Eric Albers, *A Portrait of Agriculture in Utah*, Univ. of Utah Kem C. Gardner Pol. Inst. (Dec. 2025), at 1, 10.[7]

Agriculture is thus a critical source of "economic resilience and sustainability" in Utah, one that the state takes seriously. Caroline Hargraves & Juliette Tennert, *Utah's Agriculture Economy*, Univ. of Utah Kem C. Gardner Pol. Inst. (Jan. 2025), at 2.[8] To administer "all laws, services, functions, and consumer programs related to agriculture," Utah operates a Department of Agriculture and Food. Utah Code § 4-2-102(2). That department oversees every aspect of Utah agriculture from dairy product manufacturing permits to noxious weed management. *Id.* §§ 4-3-301, 4-17-103 *et seq.* And to assist in handling broader environmental concerns, Utah also operates a Department of Environmental Quality, *id.* §§ 19-1-104 *et seq.*, as well as various county- and local-level entities.

---

[7] https://d36oiwf74r1rap.cloudfront.net/wp-content/uploads/2025/12/Portrait-of-Agriculture-Dec2025.pdf.

[8] https://d36oiwf74r1rap.cloudfront.net/wp-content/uploads/2025/02/ERG2025-Agricult-RB-Jan2025.pdf.

Nor is Utah alone in its concern for agriculture. As of 2023, agriculture accounted for a *higher* percentage of state GDP in 35 states compared to Utah. Hargraves & Tennert, *Utah's Agriculture Economy* at 2. Agriculture is often particularly important in states with fewer residents and more rural land; in South Dakota, for instance, agriculture accounts for over 10% of the state GDP, and it also surpasses that milestone in Iowa and Nebraska once the related industries of food and beverage manufacturing are accounted for. *Id.* But the three most populous states in the nation—California, Texas, and Florida—are also among the 35. Despite being urban population centers, each of these states has a significant agricultural sector: California, for instance, earns nearly $8.4 billion annually from milk alone, even before accounting for its tens of billions of dollars in fruits, vegetables, grains, and nuts every year. *2025 State Agriculture Overview: California*, USDA Nat'l Agric. Stat. Serv. (last accessed June 19, 2026).[9] Texas's 229,000 farms make it a national leader in hay (over 10.6 million tons per year) and cotton (over 5.2 million bales per year)

---

[9] https://www.nass.usda.gov/Quick_Stats/Ag_Overview/stateOverview.php?state=California.

and produce over 730 million chickens annually. *2025 State Agriculture Overview: Texas*, USDA Nat'l Agric. Stat. Serv. (last accessed June 19, 2026).[10] Florida's fruit and vegetable harvests each year also reach into the tens of billions, with strawberries, tomatoes, oranges topping the charts. *2025 State Agriculture Overview: Florida*, USDA Nat'l Agric. Stat. Serv. (last accessed June 19, 2026).[11] And each of these states also administers its own unique set of agricultural laws and regulations. *See e.g.*, California Food & Agric. Code § 101 *et seq.*; Tex. Agric. Code § 1.001 *et seq.*; Florida Stat. § 570.01 *et seq.*

States across the country—urban or rural, dry or humid, warm or cool, East or West—thus share a common interest in agriculture. That interest bears directly on state economic growth and prosperity. But it also reflects a tradition of state authority over American farmland that dates from the birth of the Republic and continues today.

---

[10] https://www.nass.usda.gov/Quick_Stats/Ag_Overview/stateOverview. php?state=Texas.
[11] https://www.nass.usda.gov/Quick_Stats/Ag_Overview/stateOverview. php?state=Florida.

**II. Agriculture flourishes when states retain the power to regulate their own farmers and ranchers—as Congress has recognized.**

The agricultural industry's importance is all the more striking when considering the diversity of the states that regulate it. The geography and weather of the Pacific Northwest or the Gulf Coast differ markedly from the Great Basin, the Great Plains, or the Great Lakes. Each region of the country faces unique circumstances based on its location, climate, and populace. Particularly in a legal tradition that has always recognized the "uniqueness of land," a one-size-fits-all farming policy would be a hopeless task. *Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989). Thus, even when state and federal government cooperate to achieve agricultural policy goals, agriculture regulation remains first and foremost a state responsibility sensitive to local concerns.

**A. States are the primary regulators of agriculture.**

Historically, the states have always shouldered the primary responsibility for ensuring safe and effective agricultural practices within their borders. When the American people agreed to be bound by a new Constitution, they understood that (in the words of Alexander

11

Hamilton) "the supervision of agriculture and of other concerns of a similar nature" were "proper to be provided for by local legislation" and could "never be desirable cares of" the federal government. The Federalist No. 17 (Alexander Hamilton) (Clinton Rossiter ed., 1961). That was obvious in light of the fact that "health and safety" have always been "'primarily, and historically, . . . matter[s] of local concern.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (quoting *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985)). And nothing is more important to the health and safety of each state's residents than access to safe and affordable food. States thus made agricultural policy a priority from the start.

Agriculture soon proved to be among the most important—and divisive—issues faced by the early Republic. The agricultural debates of the first century of American politics need no introduction; the conflict between "the New England-Midwestern model of small farms producing food crops and livestock for subsistence and local markets" and "the Southern-Western model of plantations producing cash crops for distant markets" led to serious interstate tensions for many decades. Jim Chen, *Of Agriculture's First Disobedience and Its Fruit*, 48 Vand. L. Rev. 1261,

12

1278 (1995). Even after the Civil War settled some of these tensions, the different regions—north, south, and west—pursued very different methods of agricultural production.

This pattern of diversification increased as technology advanced and Americans moved further west in the late 19th and early 20th centuries. State agriculture policies differed in areas from land use to labor, and "agricultural industries were well aware of the contrast" between different states. Paul S. Taylor, *Public Policy and the Shaping of Rural Society*, 20 S.D.L. Rev. 475, 479 (1975). For instance, states with warmer climates "where fruits and vegetables are intensively produced" approached farming differently than cooler states where rugged crops and animals were more common. *Id.* Throughout the nation's history, each state has faced unique challenges related to climate and geography, and each has experimented with agricultural policies that best fit its needs.

### B. Congressional regulation of agriculture encourages cooperative federalism, not federal fiat.

Despite its limited forays into agricultural policy, the federal government has never supplanted the states as the primary agricultural regulator. Although Congress has enacted laws that affect

the agricultural industry, the core regulatory responsibility has remained with the states. Indeed, one of the most famous examples of legislation struck down during the New Deal—an era otherwise notable for its permissiveness toward federal regulation—was the Agricultural Adjustment Act. *United States v. Butler*, 297 U.S. 1 (1936).

Aware of this, Congress passes laws affecting agriculture expecting that federal agencies will work *with* states, not against them. That requires cooperative federalism—"the teamwork of state and national officials" to achieve a common goal. *United States v. Balsys*, 524 U.S. 666, 694 (1998). Two statutes involved in this case are representative: the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), *see* 42 U.S.C. §§ 9601 *et seq.*, and the Fair Agricultural Reporting Method Act (FARM Act), *see id.* § 9603(e)(1)(B).

Begin with CERCLA, enacted "in response to the serious environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). The statute was meant "to promote 'the timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup

efforts were borne by those responsible for the contamination." *CTS Corp. v. Waldburger*, 573 U.S. 1, 4 (2014) (internal quotation marks omitted) (quoting *Burlington*, 556 U.S. at 602). To that end, CERCLA directs the EPA to "compile and annually revise a prioritized list of contaminated sites for cleanup." *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 6 (2020). It also "provide[s] a federal cause of action to recover costs of cleanup from culpable entities." *CTS Corp.*, 573 U.S. at 4. And, among other things, it imposes reporting requirements in the event that a statutorily defined amount of a "hazardous substance" is released into the environment. 42 U.S.C. § 9603(a).

But what the statute does not do is just as important as what it does. It never strips states of control over the cleanup of hazardous materials. To the contrary, it provides that "cleanup plans generally must comply with 'legally applicable or relevant and appropriate' standards of state environmental law." *Atl. Richfield Co.*, 590 U.S. at 24 (quoting 42 U.S.C. § 9621(d)(2)(A)(ii)). It generally requires the EPA to "defer initiating a cleanup at a contaminated site that a State is already remediating," thus giving states the first bite at the apple. *Id.* (citing 42 U.S.C. § 9605(h)). And it requires that states have "'substantial and

meaningful involvement' in initiating, developing, and selecting cleanup plans." *Id.* (quoting § 9621(f)(1)). CERCLA thus "views the states as independent entities that do not require the EPA's express authorization before they can act," *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 127 (2d Cir. 2010), and even affirmatively "promotes state participation," *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 138 (3d Cir. 2013). In short, in enacting CERCLA Congress eschewed "paternalistic central planning" in favor of a "spirit of cooperative federalism." *Atl. Richfield Co.*, 590 U.S. at 24 (quotation omitted).

Admittedly, CERCLA primarily focuses on environmental, not agricultural, regulation. But Congress showed the same "spirit of cooperative federalism" in enacting the FARM Act, an agriculture-specific amendment to CERCLA. To understand how, some background is useful. CERCLA contains a provision that requires reporting of "any release (other than a federally permitted release) of a hazardous substance" over a certain quantity. 42 U.S.C. § 9603(a). In 2008, the EPA finalized a rule that exempted farms from having to report releases of animal waste under CERCLA. *See* CERCLA/EPCRA

16

Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms, 73 Fed. Reg. 76948 (Dec. 18, 2008) ("2008 Rule") . Animal feces and urine contain harmful substances such as ammonia and hydrogen sulfide, but the EPA reasoned that constant reporting of ongoing emissions from those substances was "unnecessary, burdensome, and would not likely result in 'new' information regarding emissions from farms." *Id.* at 76954. EPA candidly stated that it was "unlikely" to respond to reports of such predictable (and unavoidable) emissions. *Id.* at 76955. So it enacted the 2008 Rule to lessen reporting requirements that served no purpose— and certainly no farmers.

The 2008 Rule was not without its critics, however, and a set of environmental groups sued on the basis that the Rule had created an unlawful exception to the CERCLA. *Waterkeeper All. v. EPA*, 853 F.3d 527, 530 (D.C. Cir. 2017). This Court ultimately agreed, holding that the EPA lacked authority to "ignore" CERCLA because the agency believed "the reporting requirements [we]ren't worth the trouble." *Id.* at 535. So the Court vacated the 2008 Rule and—despite the EPA's

misgivings about the usefulness of the practice—farmers again began preparing CERCLA reports about their animal waste.

But that's not where the story ends. The year after this Court vacated the 2008 Rule, Congress stepped in to address the issue. Through the FARM Act, Congress expressly exempted "air emissions from animal waste (including decomposing animal waste) at a farm" from CERCLA's reporting requirements. 42 U.S.C. § 9603(e)(1)(B). In so doing, Congress "cut[] back on CERCLA reporting requirements" and relieved farmers of the burdensome reporting requirements the EPA lacked the authority to change. *Waterkeeper All.*, 853 F.3d at 534.

Congress's enactment of the FARM Act was a direct response to federal overreach on the agricultural industry. When it saw that CERCLA had imposed reporting duties on farmers and that the EPA could not waive them, Congress acted promptly to roll back those duties. Indeed, the legislators who discussed the Act in committee made this point explicitly. The Act's sponsor described it as "a legislative fix" that "codifie[d] the original intent from the EPA's 2008 rule." Legis. Hearing on S. 2421, The Fair Agric. Reporting Method Act, 115th Cong. (2018), at 8 (statement of Sen. Deb Fischer, S. Comm. on Env't & Pub.

18

Works).[12] And the subcommittee chair ended the hearing by stating that "there is room for not just Federal, but also State and local . . . rulemaking to be involved" in the agricultural industry. *Id.* at 106 (statement of Sen. Mike Rounds, Chairman, S. Subcomm. on Superfund, Waste Mgmt., & Regul. Oversight).  Through the FARM Act, Congress provided a textbook example of cooperative federalism by trimming federal oversight and leaving more regulatory discretion to the states.

In sum, congressional action has never changed the fact that "agriculture" largely remains an "object[] of state expenditure" and regulation. The Federalist No. 34 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Though states often work hand in hand with Congress to achieve shared goals, farming and ranching have always been critical areas of state regulation—and they remain so today.

---

[12] https://www.congress.gov/115/chrg/CHRG-115shrg30052/CHRG-115shrg30052.pdf.

**III. The district court's interpretation of EPCRA is correct, beneficial, and consistent with longstanding federalism principles.**

The case on appeal turns not on the text of CERCLA or the FARM Act, but of a different statute: the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA). EPCRA contains its own set of notification requirements, which the provision at issue here ties explicitly to CERCLA's reporting requirements. Given that express connection between the statutes, the EPA promulgated an agricultural exemption to EPCRA reporting that mirrors the CERCLA exemption enacted in the FARM Act.

The district court correctly determined that EPCRA allows such an exemption. That interpretation follows from a straightforward reading of EPCRA's text. It also accords with federalism principles, leaving the states more room to regulate farms according to each state's particular circumstances. This Court should affirm the decision below.

Congress enacted EPCRA in 1986 "to provide communities with information on potential chemical hazards within their boundaries and to foster state and local emergency planning efforts to control any accidental releases." *Hüls Am. Inc. v. Browner*, 83 F.3d 445, 446 (D.C.

Cir. 1996). In its "[e]mergency notification" provision, EPCRA mandates reporting of a hazardous-substance release that must be reported under CERCLA. 42 U.S.C. § 11004(a). Of course, CERCLA's reporting requirements no longer extend to aerial emissions of animal waste because Congress specifically exempted such emissions. *See* 42 U.S.C. § 9603(e). But EPCRA also requires notification if a hazardous-substance release "occurs *in a manner* which would require notification under section 103(a) of CERCLA." 42 U.S.C. § 11004(a)(2)(C) (emphasis added). The question here is: can air emissions from animal waste still occur in such a manner after the FARM Act's passage?

Both the EPA and the district court answered that question in the negative—and rightfully so. In 2019, the EPA finalized a rule exempting animal waste air emissions from EPCRA's emergency notification requirement. *See* Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act, 84 Fed. Reg. 27533 (June 13, 2019) ("2019 Rule"). In proposing the rule, the EPA stressed the need for "consistency between the EPCRA and CERCLA reporting requirements." 83 Fed. Reg. 56791,

56793 (Nov. 14, 2018). It also quoted this Court's observation that ""[i]n drafting the EPCRA reporting requirements, Congress expressly tied them to CERCLA's' such that 'all of EPCRA's reporting mandates are piggybacked on the CERCLA mandates in one form or another.'" *Id.* (quoting *Waterkeeper All.*, 853 F.3d at 533).

Because reporting "air emissions from animal waste at farms" is no longer required under CERCLA, the EPA reasoned that such emissions cannot "'occur[] in a manner'" that would require CERCLA reporting. *Id.* (quoting 42 U.S.C. § 11004(a)(2)(C)). And after examining the relevant provision of EPCRA in context, the district court reached the same commonsense conclusion. *Rural Empowerment Ass'n for Cmty. Help v. EPA*, No. 18-2260, 2025 WL 2255085, at *4–8 (D.D.C. Aug. 7, 2025).

The EPA and the district court are correct. By its own terms, EPCRA binds its notification requirements to CERCLA's. And CERCLA's reporting requirements do "not apply" to "air emissions from animal waste (including decomposing animal waste) at a farm" because Congress recognized the burden those requirements meant for American farmers and ranchers and specifically eliminated them. 42

22

U.S.C. § 9603(e). True, EPCRA's "in a manner" provision must extend to at least some substances otherwise not covered by CERCLA, or else the provision would serve no purpose. But as the 2019 Rule explains, the EPCRA provision has force "where a CERCLA reporting exemption or the reason a release is not subject to CERCLA reporting is *unrelated to the manner* in which such releases occur." 84 Fed. Reg. at 27536. That is not the case here, where Congress specifically exempted not only a specific substance ("animal waste") but also a specific manner ("air emissions . . . at a farm") from CERCLA's requirements. The statute's plain language dictates that for aerial animal waste emissions on farms, as CERCLA goes, so goes EPCRA.

That plain reading of EPCRA also best honors the authority of states to regulate agriculture. Like CERCLA and the FARM Act, EPCRA was designed to work in tandem with state regulation, not to supplant it. As this Court explained soon after EPCRA's enactment, one of the statute's key aims is "to foster state and local emergency planning efforts." *Hüls Am.*, 83 F.3d at 446. And the "complex interplay between CERCLA and EPCRA" indicates that they were designed to be

23

"[r]ead together" when their provisions overlap. *Waterkeeper All.*, 853 F.3d at 533, 535.

EPCRA should thus not be read to impose burdens that Congress explicitly removed from CERCLA, particularly when that would do violence to the text of both statutes. Under Plaintiffs' interpretation, "State emergency response commission[s]" will receive constant waste-product release notifications from farms; states have no discretion to limit those reports to circumstances that actually constitute emergencies. 42 U.S.C. § 11004(b)(1). That would create a curious—and frustrating—regime in which both farmers and state governments are afflicted by a stream of largely useless paperwork required by federal law. Unnecessary and unwanted federal reports about well-known livestock emissions only distract from state and local efforts to plan for actual emergencies relevant to each locale. That's not cooperative federalism. States already have the power to request agriculture reports they deem necessary to properly regulate within their borders, and should be able to do so without another layer of federally mandated bookkeeping.

Congress's efforts to relieve the burden on farmers by easing CERCLA reporting requirements carry through to EPCRA. Plaintiffs' arguments to the contrary ask this Court to hold animal waste air emissions to be "within the letter of the statute and yet not within the statute." *Church of Holy Trinity v. United States*, 143 U.S. 457, 459 (1892). But this Court's interpretation of EPCRA "must be driven by 'analysis of the statute' rather than 'psychoanalysis of Congress.'" *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 608 U.S. ___, No. 24-345, 2026 WL 1686059, at *9 (U.S. June 11, 2026) (quoting *United States v. Pub. Util. Comm'n of California*, 345 U.S. 295, 319 (1953) (Jackson, J., concurring)). And a careful analysis of EPCRA leads to only one conclusion: for these types of CERCLA-exempt emissions, the emergency notification requirement does not apply.

## Conclusion

The district court's interpretation of EPCRA both follows the statute's text and honors the cooperative federalism embodied in CERCLA and the FARM Act. It is also consonant with the strong interest that states have in regulating their own agricultural industries. The Court should affirm the district court's summary judgment order.

Respectfully submitted,


Derek Brown
Utah Attorney General


*/s/ Mark C. Gillespie*
Mark C. Gillespie
*Assistant Utah Solicitor General*
Stanford Purser
*Utah Solicitor General*

Office of the Utah Attorney General
160 East 300 South, 5th Floor
P.O. Box 140858
Salt Lake City, UT 84114-0858
(385) 867-8016

*Counsel for Amicus Curiae*
*State of Utah*

## Additional Counsel

STEVE MARSHALL
Attorney General
State of Alabama

CORI MILLS
Acting Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
Commonwealth of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

RAÚL TORREZ
Attorney General
State of New Mexico

DREW WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

DAVE SUNDAY
Attorney General
Commonwealth of Pennsylvania

MARTY J. JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General
State of Tennessee

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas

KEITH G. KAUTZ
Attorney General
State of Wyoming

## Certificate of Compliance

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, this brief contains 4,472 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6), as required by Rule 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Mark C. Gillespie*
Mark C. Gillespie