**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 25-5354**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

RURAL EMPOWERMENT ASSOCIATION FOR COMMUNITY HELP, *et al.*,
*Plaintiffs-Appellants*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Defendants-Appellees*,

NATIONAL CATTLEMEN'S BEEF ASSOCIATION, et al.,
*Intervenor-Defendants-Appellees*.

---

Appeal from the United States District Court for the District of Columbia
No. 1:18-CV-02260 (Hon. District Judge Timothy J. Kelly)

---

**BRIEF OF INTERVENOR-DEFENDANTS-APPELLEES**

---

*Of counsel*:
Michael C. Formica
NATIONAL PORK PRODUCERS COUNCIL
122 C Street, NW
Suite 875
Washington, DC 20001

Travis Cushman
AMERICAN FARM BUREAU FEDERATION
600 Maryland Avenue, SW
Suite 1000

David Y. Chung
HOLLAND & HART LLP
505 Ninth Street NW
Suite 700
Washington, D.C. 20004
Phone: (202) 654-6919
dychung@hollandhart.com

*Counsel for Intervenor-Defendants-Appellees*

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

## A. Parties, Intervenors, and *Amici*

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in the Opening Brief of Plaintiffs-Appellants:

*Amici* supporting reversal: The American Lung Association and Medical Society Consortium on Climate and Health.

*Amici* supporting affirmance: The States of Utah, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, New Mexico, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, West Virginia, and Wyoming.

## B. Rulings Under Review

The district court rulings under review are listed in the Opening Brief of Plaintiffs-Appellants.

## C. Related Cases

This case has not previously been before this Court or any court other than the district court, and there are no currently pending related cases.

*/s/ David Y. Chung*
David Y. Chung

*Counsel for Intervenor-Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Intervenor-Defendants-Appellees state as follows:

American Farm Bureau Federation ("AFBF") is a "trade association" under Circuit Rule 26.1 and is headquartered in Washington D.C. AFBF has no parent company, and no publicly held corporation has a 10% or greater ownership interest in AFBF. AFBF's purpose is to advocate for farm and ranch families by shaping policies that protect profitability, promote agricultural sustainability, and support rural communities.

National Cattlemen's Beef Association ("NCBA") is a "trade association" under Circuit Rule 26.1 and is headquartered in Colorado. NCBA has no parent company, and no publicly held corporation has a 10% or greater ownership interest in NCBA. NCBA's purpose is to serve as the nation's collective voice for the U.S. cattle and beef industry.

National Pork Producers Council ("NPPC") is a "trade association" under Circuit Rule 26.1 and is headquartered in Iowa. NPPC has no parent company, and no publicly held corporation has a 10% or greater ownership interest in NPPC. NPPC's purpose is to advocate for the social, environmental, and economic sustainability of U.S. pork producers and their partners.

United States Poultry & Egg Association ("USPOULTRY") is a "trade association" under Circuit Rule 26.1 and is headquartered in Georgia. USPOULTRY has no parent company, and no publicly held corporation has a

10% or greater ownership interest in USPOULTRY. USPOULTRY's purpose is to support the U.S. poultry and egg industry through research, education, communications, and technical services.

*/s/ David Y. Chung*
David Y. Chung

*Counsel for Intervenor-Defendants-Appellees*

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ......... i

CORPORATE DISCLOSURE STATEMENT ......... ii

GLOSSARY ......... x

INTRODUCTION ......... 1

STATUTES AND REGULATIONS ......... 3

STATEMENT OF THE CASE ......... 3

A. Congress Closely Linked Emergency Reporting Requirements and Exemptions Under CERCLA and EPCRA. ......... 3

B. EPA Promulgated Contemporaneous Rules Harmonizing CERCLA's and EPCRA's Reporting Requirements. ......... 6

C. After EPA's Initial Unsuccessful Attempt to Promulgate Reporting Exemptions for Air Emissions from Animal Waste, Congress Enacted an Exemption in 2018. ......... 8

D. Consistent With Longstanding Agency Practice, EPA Concluded that the FARM Act Created a Parallel EPCRA Exemption and Codified that Exemption in 2019. ......... 9

E. Procedural Background. ......... 11

SUMMARY OF THE ARGUMENT ......... 11

ARGUMENT ......... 14

I. Under the Best Reading of EPCRA's Text, Air Emissions from Animal Waste at Farms Do Not Require Emergency Notifications. ......... 14

A. Air Emissions of CERCLA Hazardous Substances from Animal Waste at Farms Do Not Require EPCRA Notifications. ......... 14

B. Air Emissions of Extremely Hazardous Substances that Are Not Also Designated as CERCLA Hazardous Substances Are Beyond the Scope of EPCRA Section 304(a)(2) Notifications. ......... 16

C. Regardless of the Scope of Section 304(a)(2), Air Emissions from Animal Waste at Farms Do Not Require EPCRA Notifications Because They Do Not Occur in a Manner that Requires CERCLA Notification. ........ 20

D. The FARM Act's Exemption of Air Emissions from Animal Waste at Farms from CERCLA Reporting Automatically Created a Parallel Exemption Under EPCRA. ........ 23

II. Plaintiffs' Interpretation Lacks Support in EPCRA's Text, Structure, Purpose, and History. ........ 24

A. Plaintiffs' Textual Arguments Lack Merit. ........ 25

B. EPCRA's Structure and Purpose Do Not Support Plaintiffs' Interpretation. ........ 27

C. Plaintiffs' Interpretation Ignores the Most Pertinent Legislative History. ........ 29

III. The FARM Act's Inconclusive History Does Not Undermine EPA's Consistent, Longstanding Interpretation That CERCLA Reporting Exemptions Create Parallel EPCRA Exemptions. ........ 31

CONCLUSION ........ 34

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aluminum Co. v. Central Lincoln Peoples' Util. Dist.*,
467 U.S. 380 (1984)....................32

*Ctr. for Auto Safety v. Skinner*,
936 F.2d 1315 (D.C. Cir. 1991)....................33

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)....................29

*Ford v. Mabus*,
629 F.3d 198 (D.C. Cir. 2010)....................19

*FS Credit Opportunities Corp. v. Saba Capital Master Fund, Ltd.*,
608 U.S. ___, No. 24-345, 2026 WL 1686059 (U.S. June 11, 2026)....................13, 29, 32

*Hawaii v. Office of Hawaiian Affairs*,
556 U.S. 163 (2009)....................14

*Janko v. Gates*,
741 F.3d 136 (D.C. Cir. 2014)....................16

*Lorillard v. Pons*,
434 U.S. 575 (1978)....................34

*Marvin M. Brandt Revocable Trust v. United States*,
572 U.S. 93 (2014)....................13, 31

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018)....................14

*Nat'l Oilseed Processors Ass'n v. Browner*,
924 F. Supp. 1193 (D.D.C. 1996)....................27

*Optimal Wireless LLC v. IRS*,
77 F.4th 1069 (D.C. Cir. 2023)....................25

*Rotkiske v. Klemm*,
589 U.S. 8 (2019)....................18

*Russello v. United States*,
464 U.S. 16 (1983) .......... 19

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
580 U.S. 405 (2017) .......... 16

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......... 29

*Sullivan v. Finkelstein*,
496 U.S. 617 (1990) .......... 31, 32

*United States v. Laughlin*,
10 F.3d 961 (2d Cir. 1993) .......... 28

*W. Va. Univ. Hosps., Inc. v. Casey*,
499 U.S. 83 (1991) .......... 25

*Waterkeeper Alliance v. EPA*,
853 F.3d 527 (D.C. Cir. 2017) .......... 1, 8, 9, 11, 16, 23, 28

**Statutes**

42 U.S.C. § 9601(10) .......... 6

42 U.S.C. § 9601(14) .......... 3, 15

42 U.S.C. § 9601(22) .......... 4, 7, 15, 21

42 U.S.C. § 9602(a) .......... 4, 15

42 U.S.C. § 9603(a) .......... 3, 4

42 U.S.C. § 9603(e) .......... 4, 7, 15

42 U.S.C. § 9603(e)(1)(A) .......... 4, 7, 22

42 U.S.C. § 9603(e)(1)(B) .......... 1, 2, 3, 8, 9, 12, 14, 15, 21

42 U.S.C. § 9603(e)(2) .......... 9

42 U.S.C. § 9603(f) .......... 15

42 U.S.C. § 9603(f)(2) .......... 4

42 U.S.C. § 9603(f)(2) .......... 7

42 U.S.C. § 11002(a) .......... 5, 15

42 U.S.C. § 11002(a)(1) .......... 17

42 U.S.C. § 11004(a) .......... 1, 4, 14

42 U.S.C. § 11004(a)(1) .......... 2, 5, 11, 15, 18, 24

42 U.S.C. § 11004(a)(2) .......... 6, 12, 16, 17, 18, 20, 26

42 U.S.C. § 11004(a)(2)(C) .......... 3, 12, 17, 24

42 U.S.C. § 11004(a)(3) .......... 2, 5, 11, 15, 18, 24

42 U.S.C. §§ 11021-11023 .......... 13

42 U.S.C. § 11023(a) .......... 27

42 U.S.C. § 11023(h) .......... 27

42 U.S.C. § 11049(8) .......... 7

Pub L. No. 99-499, 100 Stat. 1613 (1986) .......... 4

Pub. L. No. 115-141, 132 Stat. 348 (2018) .......... 8

**Regulations**

40 C.F.R. § 302.4 .......... 4, 20

40 C.F.R. part 355 .......... 5, 15

40 C.F.R. § 355.31(c) .......... 7, 22

40 C.F.R. § 355.31(g) .......... 9

40 C.F.R. § 355.40(iv) .......... 7

40 C.F.R. § 355.61 .......... 9

40 C.F.R. § 355, Appendix A .......... 20

**Other Authorities**

132 Cong. Rec. H9561-03 .......... 30

52 Fed. Reg. 13378 (Apr. 22, 1987) .......... 6, 7, 8, 22

54 Fed. Reg. 22543 (May 24, 1989) .......... 7

55 Fed. Reg. 30166 (July 24, 1990) .......... 7

73 Fed. Reg. 76948 (Dec. 18, 2008) .......................................................... 8, 10

84 Fed. Reg. 27533 (June 13, 2019) ...................................... 1, 3, 9, 10, 11, 20,
.............................................................................................. 24, 27, 28, 29, 31, 34

H.R. Conf. Rep. No. 99-962, 284,
*reprinted in* 1986 U.S.C.C.A.N. 3276 ..................................... 6, 13, 27, 30, 31

## GLOSSARY

| | |
|---|---|
| 1987 Rule | Extremely Hazardous Substances List and Threshold Planning Quantities; Emergency Planning and Release Notification Requirements, 52 Fed. Reg. 13378 (Apr. 22, 1987) |
| 2008 Rule | CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances From Animal Waste at Farms, 73 Fed. Reg. 76948 (Dec. 18, 2008) |
| 2019 Rule | Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions From Animal Waste at Farms; Emergency Planning and Community Right-to-Know Act, 84 Fed. Reg. 27533 (June 13, 2019) |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* |
| CRS | Congressional Research Service |
| EPA | U.S. Environmental Protection Agency |
| EPCRA | Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 *et seq.* |
| FARM Act | Fair Agricultural Reporting Method Act, Pub. L. No. 115-141, §§ 1101-03, 132 Stat. 348, 1147-48 (2018) |
| NASTTPO | National Association of SARA Title III Program Officials |

## INTRODUCTION

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Emergency Planning and Community Right-to-Know Act ("EPCRA") have closely intertwined emergency notification requirements. So close that this Court previously explained that "cutting back on CERCLA reporting requirements" has the "automatic effect of cutting back on EPCRA reporting and disclosure requirements." *Waterkeeper Alliance v. EPA*, 853 F.3d 527, 534 (D.C. Cir. 2017). This is because "all of EPCRA's reporting mandates are piggybacked on the CERCLA mandates in one form or another." *Id.* at 533. When Congress exempted "air emissions from animal waste (including decomposing animal waste) at a farm" from CERCLA's immediate notification requirements in the 2018 Fair Agricultural Reporting Method Act ("FARM Act"), *see* 42 U.S.C. § 9603(e)(1)(B), that had the automatic effect of eliminating EPCRA's emergency notification requirements for those same emissions. *See id.* § 11004(a). Consistent with EPA's contemporaneous, decades-old interpretation of the interplay between CERCLA's and EPCRA's emergency notification provisions, EPA codified a corresponding exemption under EPCRA in 2019. *See* 84 Fed. Reg. 27533 (June 13, 2019) ("2019 Rule").

Plaintiffs nonetheless claim that the 2019 Rule violates EPCRA, as they seek to obtain information on releases of ammonia and hydrogen sulfide into the air from farms through section 304(a) emergency notifications. But Congress shut that door in 2018. Plaintiffs recognize, as they must, that such releases do not

require notification under either EPCRA sections 304(a)(1) or 304(a)(3), because they do not "require[] a notification under section 103(a) of [CERCLA]" after Congress enacted the FARM Act. *See* 42 U.S.C. §§ 9603(e)(1)(B), 11004(a)(1), 11004(a)(3). EPCRA section 304(a)(1) governs reporting of releases of substances like ammonia and hydrogen sulfide that are listed as extremely hazardous substances under EPCRA *and* are also listed as hazardous substances under CERCLA. EPCRA section 304(a)(3), in turn, governs reporting of releases of substances that are not listed as EPCRA extremely hazardous substances, but are listed as CERCLA hazardous substances.

Unable to obtain information on air emissions of ammonia or hydrogen sulfide from animal waste at farms under either of those provisions, Plaintiffs try door number three. Plaintiffs insist that farms must report ammonia and hydrogen sulfide air emissions from animal waste under EPCRA section 304(a)(2), but the text and history confirm that such releases are beyond the scope of that section. Section 304(a)(2) only applies to EPCRA extremely hazardous substances that are not also listed as CERCLA hazardous substances. Because ammonia and hydrogen sulfide are listed as both EPCRA extremely hazardous substances and CERCLA hazardous substances, they are not within the universe of substances that *might* require EPCRA section 304(a)(2) notifications.

But even if this Court construes EPCRA section 304(a)(2) more broadly to encompass *all* EPCRA extremely hazardous substances, even those that are also

listed as CERCLA hazardous substances, releases of such substances into the air from animal waste at farms nevertheless do not require EPCRA notification, because they do not "occur[] in a manner which would require notification under section 103(a) of CERCLA." 42 U.S.C. § 11004(a)(2)(C). By exempting the specific way in which substances are released into the environment, *see id.* § 9603(e)(1)(B), Congress removed one of three necessary predicates for EPCRA section 304(a)(2) notification.

The 2019 Rule faithfully implements the single, best reading of EPA's plain text by exempting air emissions from animal waste at farms from EPCRA section 304(a)'s emergency notification requirements. This Court should affirm.

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are contained in the Addendum to the Opening Brief of Plaintiffs-Appellants.

## STATEMENT OF THE CASE

### A. Congress Closely Linked Emergency Reporting Requirements and Exemptions Under CERCLA and EPCRA.

Under CERCLA section 103(a), persons in charge of covered facilities must immediately notify the National Response Center of any "release" of a "hazardous substance" from a facility where the release exceeds an EPA-established "reportable quantity" for that substance within a 24-hour period. 42 U.S.C. § 9603(a). Congress defined "hazardous substance" in 42 U.S.C.

§ 9601(14), and EPA has designated additional substances under 42 U.S.C. § 9602(a). The full list of CERCLA hazardous substances is in 40 C.F.R. § 302.4.

Congress created numerous exemptions from CERCLA section 103 reporting. First, the definition of "release" excludes (A) releases that result in exposure to persons solely within a workplace, (B) emissions from certain engine exhaust sources, (C) releases of certain material from a nuclear incident, and (D) the normal application of fertilizer. 42 U.S.C. § 9601(22). Because only "release[s]" require section 103 reporting, there is no need to report any of the foregoing activities under CERCLA. *See id.* § 9603(a).

Congress also enacted reporting exemptions within section 103. For instance, there is no need to provide immediate notification of "the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act ["FIFRA"] . . . or the handling and storage of such a pesticide[.]" *Id.* § 9603(e)(1)(A) (formerly § 9603(e)). Likewise, there is no need to provide immediate notification of the "release of a hazardous substance . . . which is a continuous release, stable in quantity and rate," because such releases are instead reported annually and only when there is a "statistically significant increase" from prior annual reports. *Id.* § 9603(f)(2).

Congress enacted EPCRA in 1986, which contains a parallel reporting provision entitled "Emergency notification." *See* Pub L. No. 99-499, 100 Stat. 1613 (1986); *see also* 42 U.S.C. § 11004(a). Owners or operators of certain facilities must provide immediate notification of releases to state and local

emergency response authorities under EPCRA section 304(a) in three specific instances:

*First*, under section 304(a)(1), one must report the release of any "extremely hazardous substance" if "such release requires a notification under section 103(a) of [CERCLA.]" 42 U.S.C. § 11004(a)(1). EPA designates extremely hazardous substances for EPCRA purposes under section 102(a), *see id.* § 11002(a), and a complete list of extremely hazardous substances is in the Appendices to 40 C.F.R. part 355. That list is *not* identical to the list of CERCLA hazardous substances. There are substances that appear on only one list, so the lists of extremely hazardous substances (under EPCRA) and hazardous substances (under CERCLA) overlap like a Venn diagram. If a substance appears on both lists, EPCRA section 304(a)(1) governs whether notification is required to state and local emergency response authorities. 42 U.S.C. § 11004(a)(1).

*Second*, under EPCRA section 304(a)(3), one must report the release of a substance that is *not* designated as an EPCRA extremely hazardous substance if "such release requires notification under [CERCLA] section 103(a)." 42 U.S.C. § 11004(a)(3). Thus, if a substance appears only on CERCLA's list of hazardous substances, and not on EPCRA's list of extremely hazardous substances, EPCRA section 304(a)(3) governs whether notification is required to state and local emergency response authorities. *Id.*

*Third*, EPCRA section 304(a)(2) applies to EPCRA extremely hazardous substances that are "not subject to the notification requirements under" CERCLA

section 103(a). The Conference Report on EPCRA makes clear that this section only applies when there is a release of an EPCRA extremely hazardous substance that is not also designated as a CERCLA hazardous substance: "This requires notification where there is a release of an extremely hazardous substance that would require notice under section 103(a) of CERCLA *but for the fact that the substance is not specifically listed under CERCLA as requiring such notice*." H.R. Conf. Rep. No. 99-962, 284, *reprinted in* 1986 U.S.C.C.A.N. 3276, 3377 (emphasis added). In that situation, the release of an EPCRA extremely hazardous substance (that is not also a CERCLA hazardous substance) need only be reported if it satisfies three requirements: (1) it is not a federally permitted release within the meaning of 42 U.S.C. § 9601(10); (2) it is in an amount in excess of an EPA-determined reportable quantity; and (3) it "occurs in a manner which would require notification under section 103(a) of CERCLA." *Id.* § 11004(a)(2).

### B. EPA Promulgated Contemporaneous Rules Harmonizing CERCLA's and EPCRA's Reporting Requirements.

Within months of EPCRA's enactment, EPA promulgated regulations clarifying the connection between EPCRA's and CERCLA's immediate notification provisions. 52 Fed. Reg. 13378, 13381 (Apr. 22, 1987) ("1987 Rule"). EPA explained how Congress' creation of reporting exemptions in CERCLA effectively created parallel exemptions under EPCRA.

EPA first addressed a discrepancy in the statutory definitions of "release." EPCRA's definition of "release" mirrors only the first part of CERCLA's

definition. *Compare* 42 U.S.C. § 11049(8) *with id.* § 9601(22). Although the statutory exclusions from CERCLA's definition of release do not appear in EPCRA's definition of release, EPA aligned the reporting requirements under both statutes by exempting releases from engine exhaust, nuclear incidents, and the normal application of fertilizer from EPCRA reporting. 52 Fed. Reg. at 13384-85.

EPA also recognized CERCLA's exemption for the application of pesticides registered under the Federal Insecticide, Fungicide, and Rodenticide Act or the handling and storage of such pesticides by agricultural producers. *See* 42 U.S.C. § 9603(e)(1)(A) (formerly § 9603(e)). EPA expressly exempted those same activities from EPCRA's reporting requirements. *See* 52 Fed. Reg. at 13384-85.[1]

Finally, EPA applied CERCLA's exemption for continuous releases to EPCRA reporting. *See id.* § 9603(f)(2); *see also* 52 Fed. Reg. at 13381. EPA later codified definitions of "continuous" and "statistically significant increase." 55 Fed. Reg. 30166, 30179 (July 24, 1990). EPA added those definitions to "clarify the meaning of the statutory phrase [from EPCRA], 'occurs in a manner which would require notice under CERCLA section 103(a).'" *Id.*

---

[1] EPA promulgated this exemption in 1987, but it inadvertently omitted regulatory text in the 1987 Rule. EPA remedied that omission through a 1989 technical amendment. *See* 54 Fed. Reg. 22543 (May 24, 1989); 40 C.F.R. § 355.31(c) (formerly 40 C.F.R. § 355.40(iv)).

As EPA explained in its 1987 Rule, these CERCLA exemptions effectively create parallel exemptions under EPCRA section 304(a)(2): none of these three categories of releases "occur in a manner" that would require immediate notification under that CERCLA section 103(a). *See* 52 Fed. Reg. at 13384-85.

### C. After EPA's Initial Unsuccessful Attempt to Promulgate Reporting Exemptions for Air Emissions from Animal Waste, Congress Enacted an Exemption in 2018.

EPA finalized a rule in 2008 exempting all farms from having to report releases of hazardous substances emitted into the air from animal waste under CERCLA and exempting small farms from having to report releases of extremely hazardous substances under EPCRA. *See* 73 Fed. Reg. 76948 (Dec. 18, 2008) ("2008 Rule"). EPA explained that reports "are unnecessary because, in most cases, a federal response is impractical and unlikely (i.e., [the EPA] would not respond to them since there is no reasonable approach for the response)." *Id.* at 76956. Unlike the 1987 Rule, EPA could not point to any clear statutory exemption in CERCLA to justify those exemptions and thus, the D.C. Circuit invalidated the 2008 Rule in *Waterkeeper*, 853 F.3d 527. In response, Congress passed the FARM Act in 2018. *See* Pub. L. No. 115-141, §§ 1101-1103, 132 Stat. 348, 1147-48 (2018). The FARM Act amended CERCLA section 103(e) to expressly exempt all farms from having to report air emissions from animal waste. *See id.* The FARM Act's exemption is codified at 42 U.S.C. § 9603(e)(1)(B).

### D. Consistent With Longstanding Agency Practice, EPA Concluded that the FARM Act Created a Parallel EPCRA Exemption and Codified that Exemption in 2019.

EPA promulgated the 2019 Rule after the FARM Act's passage. *See* 84 Fed. Reg. 27533. The rule exempts "[a]ir emissions from animal waste (including decomposing animal waste) at a farm" from EPCRA's emergency notification requirements. *Id.* at 27542. That language is identical to the FARM Act's CERCLA exemption. *Compare* 42 U.S.C. § 9603(e)(1)(B) *with* 40 C.F.R. § 355.31(g). The 2019 Rule also includes the FARM Act's definitions of "animal waste" and "farm." *Compare* 42 U.S.C. § 9603(e)(2) *with* 40 C.F.R. § 355.61.

In the 2019 Rule, EPA noted that members of the National Association of SARA Title III Program Officials ("NASTTPO")[2] wrote to EPA about EPCRA reporting for livestock operations in the wake of this Court's *Waterkeeper* decision. *See* 84 Fed. Reg. at 27538. NASTTPO's letter indicated that the release reports for air emissions from animal waste at farms provide "no particular value" to local agencies and first responders and are "generally ignored." *See* Letter from Timothy R. Gablehouse, NASTTPO to U.S. EPA, EPA-HQ-OLEM-2018-0318-0224, Attachment 2 (June 1, 2017), JA210. NASTTPO states that "open dialogue and coordination" among farms and local agencies can be "more effective than release reporting" to address animal waste management at farms. *Id.* Notably,

---

[2] NASTTPO members include State Emergency Response Commissions, Tribal Emergency Response Commissions (TERCs), and Local Emergency Planning Committees (LEPCs). *See* https://nasttpo.com/.

although NASTTPO had "opposed broad exemptions from air release reporting obligations years ago," it supported the 2019 Rule, stating that "[l]itigation and legislation have intervened and now it is clear that relief from air release reporting obligations under EPCRA for animal wastes produced by the animal agriculture sectors of the economy are appropriate." NASTTPO, Comments, EPA-HQ-OLEM-2018-0318-0238 (Dec. 14, 2018), JA294-95.

NASTTPO's change of heart on the exemption of air emissions from animal waste at farms came as no surprise. As EPA observed in finalizing the 2019 Rule, it "received comments from state and local emergency responders that animal waste air emission reports they received from large livestock farms in 2009 did not provide any valuable information, but rather it was needless paperwork and acted as an impediment." EPA, Resp. to Comments at 20, EPA-HQ-OLEM-2018-0318 (June 4, 2019), JA404. Relatedly, the rulemaking record contains numerous sworn declarations detailing the chaos that ensued when owners and operators of livestock farms tried to report under EPA's ill-fated 2008 Rule. *E.g.*, NCBA Comments, EPA-HQ-OLEM-2018-0318-0387, at 113-178, JA310-375 (collecting declarations from 2009 and 2017 describing how emergency responders were confused by the influx of reports submitted under the 2008 Rule). And it bears emphasis that, in many rural communities, livestock producers "also serve as volunteer fire fighters and EMTs and are [the] state's first responders for accidents, prairie fires, blizzards, and other natural disasters." S.D. Cattlemen's Ass'n Comments, EPA-HQ-OLEM-2018-0318-0389 (Dec. 14,

2018), JA296. Reports about routine emissions from animal waste from their own farms do not facilitate emergency responses.

### E. Procedural Background.

EPA's brief details the relevant proceedings below. *See* EPA Br. at 8-10.

## SUMMARY OF THE ARGUMENT

The district court correctly concluded that the 2019 Rule does not contravene EPCRA. This Court should affirm.

1. EPCRA's text makes clear that air emissions from animal waste at farms do not require emergency notifications to state and local emergency responders. EPCRA section 304(a)'s "reporting mandates are piggybacked on the CERCLA mandates in one form or another." *Waterkeeper*, 853 F.3d at 533. Thus, when Congress exempted air emissions from animal waste at farms from CERCLA section 103(a) reporting in the 2018 FARM Act, that "had the automatic effect of cutting back on [the parallel] EPCRA reporting and disclosure requirements." *Id.* at 534.

EPCRA sections 304(a)(1) and 304(a)(3) require notification only when a release "requires notification under section 103(a)" of CERCLA. 42 U.S.C. §§ 11004(a)(1), 11004(a)(3). The former governs reporting of EPCRA extremely hazardous substances that are also CERCLA hazardous substances; the latter governs reporting of "non-11002(a) substance[s]," *i.e.*, CERCLA hazardous substances that are not also listed as extremely hazardous under EPCRA. Because the FARM Act exempted air emissions of all CERCLA hazardous substances into

the air from animal waste at farms, releases of those substances do not require EPCRA notification either.

EPCRA's remaining emergency notification provision, section 304(a)(2), governs extremely hazardous substances that are "not subject to" CERCLA notification. 42 U.S.C. § 11004(a)(2). When read in context, section 304(a)(2) governs only release reporting of EPCRA extremely hazardous substances that are not also CERCLA hazardous substances. Thus, releases of ammonia and hydrogen sulfide, which are both EPCRA extremely hazardous substances and CERCLA hazardous substances, are beyond the reach of 304(a)(2). This interpretation of section 304(a)(2)'s scope avoids redundancy, gives effect to textual distinctions within subsections of section 304(a), and is confirmed by the 1986 Conference Report.

But even if section 304(a)(2)'s scope extends to all extremely hazardous substances, EPCRA notification is still not required for air emissions from animal waste at farms, because such releases do not "occur in a manner which would require notification under section 103(a) of CERCLA." 42 U.S.C. § 11004(a)(2)(C). When Congress exempted such emissions from CERCLA reporting, it described a "manner" of release (emitting) and limited that manner of release to a specific source (animal waste) at a specific location (a farm). *See id.* § 9603(e)(1)(B). Consequently, such emissions do not require EPCRA notification, even under Plaintiffs' own interpretation during proceedings below.

2. Plaintiffs' textual arguments on appeal are meritless. Plaintiffs now claim that air emissions from animal waste at farms require EPCRA notification, because the FARM Act exemption does not describe a unique way of emitting. To the extent that interpretation is not forfeited, it is both counter to EPCRA's text (which does not impose a uniqueness requirement) and untrue factually (because the FARM Act's exemption *does* describe a unique way of emitting). Plaintiffs' structure, purpose, and history arguments all overlook that EPCRA section 304's basic purpose is to facilitate state and local emergency responses to accidental releases. Plaintiffs quote selectively from case law and legislative history related to more general reporting requirements in a different subchapter of EPCRA (42 U.S.C. §§ 11021-11023), while ignoring the most pertinent discussions of EPCRA's emergency notification provision in the 1986 Conference Report. *See* H.R. Conf. Rep. No. 99-962, at 284, 292, *reprinted in* 1986 U.S.C.C.A.N. 3276, 3377, 3385.

3. Plaintiffs' reliance on the FARM Act's legislative history is misplaced, as the "views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93, 109 (2014). The floor statements, Congressional Research Service findings, and witness testimony that Plaintiffs cite carry no weight; "rather than trying to unearth Congress's 'actual intent'" from the sources Plaintiffs cite, this Court must "look for 'objectified intent'—the intent that a reasonable person would gather from the text of the law." *FS Credit Opportunities Corp. v. Saba*

*Capital Master Fund, Ltd.*, 608 U.S. ___, No. 24-345, 2026 WL 1686059, at *7 n.5 (U.S. June 11, 2026). All that matters here is EPCRA's text, not what a handful of individuals believed decades later.

## ARGUMENT

### I. Under the Best Reading of EPCRA's Text, Air Emissions from Animal Waste at Farms Do Not Require Emergency Notifications.

All parties agree that statutory interpretation must "begin, as always, with the text of the statute." *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 173 (2009). When the text is clear, the inquiry "ends there as well." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018). Here, EPCRA's plain text makes clear that when Congress exempts the way chemical substances are released into the environment from CERCLA section 103(a)'s immediate notification requirements, like when Congress exempted air emissions from animal waste at farms in the FARM Act, *see* 42 U.S.C. § 9603(e)(1)(B), such releases do not require emergency notifications under EPCRA section 304(a). *See id.* § 11004(a).

#### A. Air Emissions of CERCLA Hazardous Substances from Animal Waste at Farms Do Not Require EPCRA Notifications.

There is no dispute that air emissions from animal waste at farms do not require notification under EPCRA section 304(a)(1) or 304(a)(3), because such releases have not required notification under section 103(a) of CERCLA since Congress enacted the FARM Act. *See* 42 U.S.C. § 9603(e)(1)(B). EPCRA section

304(a)(1) requires notification of the release of a "11002(a)" substance[3] only if a "release requires notification under section 103(a) of CERCLA." *Id.* § 11004(a)(1). Similarly, EPCRA section 304(a)(3) requires notification of the release of a "non-11002(a)" substance (*i.e.*, a substance that is not an EPCRA extremely hazardous substance) only if a "release requires notification under section 103(a) of CERCLA." *See id.* § 11004(a)(3). For a release to "require[] notification under [CERCLA] section 103(a)," it logically must: (i) involve a chemical substance that is defined or designated as a CERCLA "hazardous substance," *see* 42 U.S.C. §§ 9601(14), 9602(a); *and* (ii) not be statutorily excluded from CERCLA's definition of "release" under 42 U.S.C. § 9601(22), exempt from reporting under 42 U.S.C. § 9603(e), or exempt from reporting under 42 U.S.C. § 9603(f).

Here, Congress exempted all CERCLA hazardous substances released into the air from animal waste at farms from CERCLA section 103(a) reporting. *See* 42 U.S.C. § 9603(e)(1)(B). Such releases therefore do not require notification under EPCRA, regardless of whether they are also EPCRA extremely hazardous substances (*see id.* § 11004(a)(1)) or not (*see id.* § 11004(a)(3)), because the CERCLA exemption in the FARM Act "had the automatic effect of cutting back

[3] As noted above, *supra* at 5, an "11002(a) substance" is one that is published on EPA's list of extremely hazardous substances. 42 U.S.C. § 11002(a); *see also* 40 C.F.R. part 355 Appendices A & B.

on [the parallel] EPCRA reporting and disclosure requirements." *Waterkeeper*, 853 F.3d at 534.

### B. Air Emissions of Extremely Hazardous Substances that Are Not Also Designated as CERCLA Hazardous Substances Are Beyond the Scope of EPCRA Section 304(a)(2) Notifications.

Because air emissions from animal waste at farms do not require EPCRA notification under sections 304(a)(1) or 304(a)(3), that leaves only EPCRA section 304(a)(2), which governs notification of "other 11002(a) substance[s]." 42 U.S.C. § 11004(a)(2). As the text makes clear, section 304(a)(2) only applies to extremely hazardous substances that are "not subject to the notification requirements of section 103(a) of CERCLA." *Id.* Thus, releases of substances like ammonia and hydrogen sulfide, which are both EPCRA extremely hazardous substances and CERCLA hazardous substances, are not covered by section 304(a)(2).

Congress did not define what "not subject to the notification requirements of section 103(a) of CERCLA" means. Although turning to dictionaries is "unlikely to resolve the ambiguity," the meaning of that phrase "is informed by the context in which the words appear." *Janko v. Gates*, 741 F.3d 136, 140-41 (D.C. Cir. 2014); *see also Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) ("[I]nterpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning."). Here, EPCRA section 302(a) illustrates the limited scope of section 304(a)(2). Section 302(a) says "[a] substance is *subject to the requirements* of

this subchapter if the substance is *on the list* published under [EPCRA section 302(a)(2)].” 42 U.S.C. § 11002(a)(1) (emphasis added). Section 304(a)(2) uses the nearly identical phrase “not *subject to the notification requirements* of section 103(a) of CERCLA.” *Id.* § 11004(a)(2) (emphasis added). Reading these two together, the best interpretation of section 304(a)(2) is that it governs only releases of extremely hazardous substances that are not also defined or designated as a CERCLA hazardous substance.[4]

This interpretation avoids redundancy. If the phrase “not subject to the notification requirements” is construed more broadly to mean that a release does not require notification either because it does not involve a CERCLA hazardous substance or because it is statutorily exempt from reporting, it makes no sense to ask whether that release “occurs in a manner which would require notification under section 103(a).” *See* 42 U.S.C. § 11004(a)(2)(C). Once Congress exempts a release from CERCLA section 103(a) reporting, that release would *never* occur in a manner that requires notification under section 103(a). By contrast, if a release of an extremely hazardous substance is “not subject to” CERCLA section 103(a) notification because that substance is not a CERCLA hazardous substance,

---

[4] This is no small universe of substances. There are *hundreds* of EPCRA extremely hazardous substances that are not also CERCLA hazardous substances. *See* EPA, “Consolidated List of Chemicals Subject to the Emergency Planning and Community Right-To-Know Act (EPCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), Section 112(r)(7) of the Clean Air Act (CAA), and Section 311(j)(5) of the Clean Water Act (CWA)” (Apr. 2025) (hereinafter, “Consolidated List”).

it *does* make sense to ask (for purposes of determining if notification is required under EPCRA) whether the release "occurs in a manner which would require notification under [CERCLA] section 103(a)" *if* that substance was also designated as a CERCLA "hazardous substance."

Furthermore, confining EPCRA section 304(a)(2) to just those extremely hazardous substances that are not also CERCLA hazardous substances gives effect to the textual differences within EPCRA section 304(a). EPCRA sections 304(a)(1) and (a)(3) use the phrase "requires a notification under section 103(a) of CERCLA," which necessarily means the substance being released is a CERCLA hazardous substance and that Congress did not exempt the release from reporting elsewhere in CERCLA. *See* 42 U.S.C. §§ 11004(a)(1), 11004(a)(3). In section 304(a)(2), Congress could have said the opposite—*i.e.*, "does not require a notification under section 103(a) of CERCLA." That would have clearly encompassed both when a release does not involve a CERCLA hazardous substance and when Congress exempts the release of a CERCLA hazardous substance from reporting. In either instance, the release does not require notification. But Congress did not say that in section 304(a)(2). Instead, Congress used the distinct phrase "*not subject to* the notification requirements under section 103(a)." *Id.* § 11004(a)(2) (emphasis added).

Because Congress "says in a statute what it means and means in a statute what it says there," *Rotkiske v. Klemm*, 589 U.S. 8, 13-14 (2019), this Court should "refrain from concluding here that the differing language in the two

subsections has the same meaning in each." *Russello v. United States*, 464 U.S. 16, 23 (1983). "[I]t is through the 'dint of phrasing' that Congress speaks, and where it uses different language in different provisions of the same statute, we must give effect to those differences." *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010). Read in context alongside EPCRA section 302(a), section 304(a)(2) is best interpreted as referring to the release of an EPCRA extremely hazardous substance that is "not subject to" CERCLA's notification requirements because the release does not involve a CERCLA hazardous substance.

This interpretation is the one that Congress intended, as the legislative history confirms (*see infra* Part II.C). It is also EPA's interpretation. *E.g.*, EPA Br. at 5 (Section 304(a)(2) "requires reporting of certain 'extremely hazardous substances' identified by EPA that do not already fall within CERCLA's definition of 'hazardous substance[s].'"); *id.* at 19-21 (detailing distinction between "extremely hazardous substances" under EPCRA and "hazardous substances" under CERCLA and concluding that "Congress carefully crafted EPCRA section 304(a)(2) to require EPCRA reporting for certain releases of extremely hazardous substances that are not defined as hazardous substances under CERCLA").

To be clear, the precise scope of EPCRA section 304(a)(2) matters deeply in this case, because ammonia and hydrogen sulfide are the only substances that Plaintiffs and their *amici* appear focused on in their quest to require farms to submit EPCRA emergency notifications. *See* Pls' Opening Br. at 1, 3-8, 17; Am.

Lung Ass'n Br. at 2-4, 10.[5] Both of those substances are listed as "extremely hazardous substances" under EPCRA, *see* 40 C.F.R. § 355 App. A, and as "hazardous substances" under CERCLA. *See id.* § 302.4. Consequently, both are beyond the reach of EPCRA section 304(a)(2) notifications.

### C. Regardless of the Scope of Section 304(a)(2), Air Emissions from Animal Waste at Farms Do Not Require EPCRA Notifications Because They Do Not Occur in a Manner that Requires CERCLA Notification.

As detailed above in Part I.B, EPCRA section 304(a)(2) only applies to releases of extremely hazardous substances that are not also CERCLA hazardous substances. But not every such release requires notification. Rather, "Congress tempered this additional duty" by requiring EPCRA notification "only if the release 'occurs in a manner' requiring notification under CERCLA" EPA Br. at 5 (quoting 42 U.S.C. § 11004(a)(2)). So even if this Court finds that EPCRA section 304(a)(2) more broadly encompasses *all* extremely hazardous substances, EPA's brief ably explains why the 2019 Rule advances the single, best reading of EPCRA—namely, releases of EPCRA extremely hazardous substances into the air from animal waste at farms do not "occur[] in a manner which would require notification under section 103(a) of CERCLA." EPA Br. at 15-28.

---

[5] Plaintiffs' *amici* also refer to methane in their brief (at 10), but methane is neither an EPCRA extremely hazardous substance nor a CERCLA hazardous substance. *See* Consolidated List at 43; *see also* 40 C.F.R. § 355 App. A; *id.* § 302.4.

Agricultural Intervenors incorporate EPA's arguments by reference and do not repeat them here. Rather, Agricultural Intervenors emphasize two points:

*First*, Plaintiffs agreed with EPA's interpretation in the briefing below. Plaintiffs argued that "Congress can narrow the *manners* of release that require notification under CERCLA *either* by creating an exemption from CERCLA's definition of 'release,' as it has done for 'emissions from the engine exhaust of a motor vehicle' and 'the normal application of fertilizer,' 42 U.S.C. § 9601(22), *or* by creating an exemption from CERCLA's notification requirements that incorporates and modifies the manners of release that require notification, as it has done for continuous releases." Pls' MSJ Reply Br., at 8, JA156. Plaintiffs effectively conceded that "creating an exemption that incorporates and modifies the manners of release that require notification under CERCLA" would "create a parallel exemption under EPCRA." *Id.* at 9, JA157. As EPA's brief explains, and as the district court had little difficulty concluding, that is precisely what Congress did in 42 U.S.C. § 9603(e)(1)(B). *See* EPA Br. at 17-18; *see also* Dist. Ct. MSJ Mem. Op. at 13-15, JA199-201.

Plaintiffs cannot credibly dispute that the FARM Act exemption expressly incorporates a specific manner of release ("emitting") and modifies that manner of release by limiting it to a specific source ("animal waste") and specific locations ("farms"). Importantly, other ways of releasing substances like ammonia or hydrogen sulfide from animal waste at farms would still require reporting, such as releases into a waterway resulting from a lagoon breach or the

pumping or dumping of animal waste (and extremely hazardous substances therein), as would or other ways of emitting those substances "such as a reportable release from an anhydrous ammonia storage tank into the air." EPA, Resp. to Comments, at 13, JA397; *see also id*. at 14, JA398 ("This rule does not apply to releases of substances from animal waste into non-air environmental media, nor to releases into the air from sources other than animal waste or decomposing animal waste at a farm."). Those examples underscore that Congress exempted the manner in which a release occurs and thus, why notification under EPCRA section 304(a)(2) is not required.

*Second*, Plaintiffs' concession (at 24-25) that Congress's exemption of "the application of a [registered] pesticide product or the handling and storage of such a pesticide product by an agricultural producer" under CERCLA created a parallel EPCRA exemption is fatal. *See* 42 U.S.C. § 9603(e)(1)(A). The pesticide exemption is codified in the same subsection of CERCLA as the FARM Act exemption, and EPA has recognized that exemption applies to EPCRA notifications since 1987. *See* 52 Fed. Reg. 13384-85; 40 C.F.R. § 355.31(c). And like the FARM Act exemption, the pesticide exemption only covers certain manners of release. It does not cover, for instance, releases from a pesticide tank explosion, releases during the disposal of pesticides, or releases during the storage and handling by an entity other than an agricultural producer. *See* EPA, Resp. to Comments, at 15, JA399 (emphasizing that "[o]nly a certain manner of pesticide release – proper application – would not require reporting"). Here, again, the key

is the "manner" in which an EPCRA extremely hazardous substances enter the environment. There is simply no meaningful distinction between CERCLA's pesticide exemption and the neighboring FARM Act exemption.

### D. The FARM Act's Exemption of Air Emissions from Animal Waste at Farms from CERCLA Reporting Automatically Created a Parallel Exemption Under EPCRA.

Because CERCLA section 103(a)'s immediate notification requirement is inextricably linked to EPCRA section 304(a)'s emergency notification requirement, when Congress "cut[] back on CERCLA reporting requirements [in the FARM Act, that] had the *automatic effect* of cutting back on EPCRA reporting and disclosure requirements." *Waterkeeper*, 853 F.3d at 534 (emphasis added). As this Court previously explained, "[i]n drafting the EPCRA reporting requirements, Congress expressly tied them to CERCLA's. . . . *Thus all of EPCRA's reporting mandates are piggybacked on the CERCLA mandates in one form or another*." *Id.* at 533 (emphasis added). Consequently, when Congress amended CERCLA section 103(e) to exempt air emissions of all CERCLA hazardous substances from animal waste at farms from CERCLA reporting, that automatically cut back on the requirement to report releases of those same substances under EPCRA.

The practical effect of the FARM Act exemption is as follows: Under EPCRA section 304(a)(1), releases of EPCRA extremely hazardous substances that are also CERCLA hazardous substances (*e.g.*, ammonia or hydrogen sulfide), do not require EPCRA notification, because such releases do not "require[] a

notification under section 103(a) of CERCLA." 42 U.S.C. § 11004(a)(1). Similarly, under EPCRA section 304(a)(3), releases of "non-11002(a)" substances (*i.e.*, substances that are not listed as extremely hazardous under EPCRA) but that *are* CERCLA hazardous substances (*e.g.*, acetic acid or hexane) do not "require[] a notification under section 103(a) of CERCLA." 42 U.S.C. § 11004(a)(3). Finally, under EPCRA section 304(a)(2), releases of EPCRA extremely hazardous substances that are "not subject to" CERCLA notification because they are not listed as CERCLA hazardous substances do not need to be reported under EPCRA because they do not "occur[] in a manner which would require notification under section 103(a) of CERCLA." 42 U.S.C. § 11004(a)(2)(C).

## II. Plaintiffs' Interpretation Lacks Support in EPCRA's Text, Structure, Purpose, and History.

Although Congress made it clear that releases of extremely hazardous substances into the air from animal waste at farms no longer occur in a manner that would require CERCLA notification, which necessarily means such releases no longer require notification under EPCRA section 304(a)(2), Plaintiffs insist that the 2019 Rule conflicts with their novel reading of EPCRA's text and their selective characterizations of EPCRA's structure, purpose and history. Plaintiffs' attacks on the 2019 Rule miss the mark.[6]

[6] As EPA explains (at 23-24, 26), Plaintiffs' interpretation also runs counter to EPA's contemporaneous, decades-old interpretation of the interplay between CERCLA section 103 and EPCRA section 304.

### A. Plaintiffs' Textual Arguments Lack Merit.

For starters, Plaintiffs did not argue in the district court that air emissions from animal waste at farms still require EPCRA notification because the FARM Act exemption does not identify a unique way *of emitting*. Thus, they forfeited this interpretation. Plaintiffs previously argued that when Congress "create[es] an exemption that incorporates and modifies the manners of release that require notification under CERCLA," that "create[s] a parallel exemption under EPCRA. Pls' MSJ Reply Br. at 8-9, JA156-57. That is exactly what Congress did in the FARM Act, as the district court cogently explained. Dist. Ct. MSJ Mem. Op. at 13-15, JA199-201. Plaintiffs cannot now raise the bar on appeal by claiming that a CERCLA exemption does not create a parallel exemption under EPCRA unless it indicates that a "particular 'emitting' (or 'escaping') happens in a unique way that would not require notification under CERCLA." Pls' Opening Br. at 26. "Because [Plaintiffs] did not raise that argument to the district court in the first instance, [this Court should] decline to consider it on appeal." *Optimal Wireless LLC v. IRS*, 77 F.4th 1069, 1077 (D.C. Cir. 2023).

Forfeiture aside, Plaintiffs' new interpretation flouts the foundational principle that courts are "to make sense rather than nonsense" out of federal statutes. *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100-01 (1991). Plaintiffs waffle between arguing that "manner" describes "how a release happens" and that it describes "how emitting happens," *see* Pls' Opening Br. at 21-25, before improperly equating the two concepts. *See id.* at 29 ("'[M]anner' describes the

way a release occurs—here, how emitting happens.”). Obviously, there is a difference between describing how a release happens (*e.g.*, emitting ammonia into the air versus spilling or pouring ammonia solution into a lake) and describing how emitting happens (*e.g.*, sudden emissions of ammonia from an exploding industrial tank versus gradual emissions of ammonia from decomposing animal manure). Only the former is relevant here. EPCRA section 304(a)(2) asks whether “*the release* . . . occurs in a manner which would require notification”; it does not also require that a particular manner of release (*e.g.*, emitting) occurs in a unique way. 42 U.S.C. § 11004(a)(2). Plaintiffs’ interpretation is far afield from EPCRA’s text.

In all events, as EPA’s brief details (at 31-33), the FARM Act exemption does specify a unique way of emitting hazardous substances such as ammonia or hydrogen sulfide, so releases covered by that exemption need not be reported under EPCRA. Again, common sense tells us the gradual, expected emission of chemical substances from decomposing animal waste into the air is distinct from the rapid, unexpected emission of the same chemical substances into the air from a tank explosion at a manufacturing facility. Even if this Court accepts Plaintiffs’ new interpretation of EPCRA section 304(a)(2), air emissions of extremely hazardous substances that are exempt from CERCLA reporting under the FARM Act are sufficiently unique from other ways of emitting those same substances. The former do not occur in a manner that require CERCLA notification, so they do not require EPCRA notification either.

### B. EPCRA's Structure and Purpose Do Not Support Plaintiffs' Interpretation.

Plaintiffs' structure and purpose arguments boil down to a single contention: CERCLA does not have a public disclosure component, so the 2019 Rule undermines EPCRA's reporting structure and public disclosure purpose by applying the FARM Act's exemption to EPCRA reporting. *See* Pls' Opening Br. at 30-31. In so arguing, Plaintiffs mischaracterize both statutes.

Plaintiffs cite *Nat'l Oilseed Processors Ass'n v. Browner* for the proposition that EPCRA's "central premise" is providing access to information on potential chemical hazards. Pls' Opening Br. at 31 (quoting 924 F. Supp. 1193, 1197 (D.D.C. 1996)). But that case never mentions EPCRA section 304 ("Emergency notification") and only addresses toxic release inventory reporting under section 313. *See Browner*, 924 F. Supp. at 1197; *see also* 42 U.S.C. § 11023(a), (h). When Congress enacted those provisions in 1986, it explained that "section [313] establishes requirements for annual reporting on releases of certain toxic chemicals to the environment. This reporting covers releases that occur as a result of normal business operations, *as distinct from abnormal, emergency releases which must be reported under section 304*." H.R. Conf. Rep. No. 99-962, 292, *reprinted in* 1986 U.S.C.C.A.N. 3276, 3385 (emphasis added).

The 2019 Rule appropriately emphasized that the basic purpose of section 304 emergency notification, however, "is for facilities to inform state and local agencies of accidental releases *so that these agencies can exercise the local*

*emergency response plan if necessary*." 84 Fed. Reg. at 27538 (emphasis added). And as EPA's record confirms, requiring reports of air emissions from animal waste at farms does not advance this basic purpose. *See id.* (summarizing a 2017 letter from NASTTPO, an association of state and local emergency response officials, which explained that "release reports for air emissions from animal waste at farms provide little value to local agencies and first responders, and are generally ignored"). This is because such releases are not accidental or one-off emergencies requiring emergency response, but are instead gradual, continuous releases that are well-known. *See id.* ("The natural breakdown of livestock manure does not constitute an emergency release.").

Like EPCRA section 304, CERCLA section 103's purpose is to "insure[] the Government's ability to move quickly to check the spread of a hazardous release." *United States v. Laughlin*, 10 F.3d 961, 966 (2d Cir. 1993) (internal quotation marks and citation omitted). These two provisions do not serve "distinct purposes" (Pls' Opening Br. at 30); rather, it is because they are so intertwined that this Court has described the link between the two as "automatic." *Waterkeeper*, 853 F.3d at 534.[7] The 2019 Rule serves both EPCRA's and

[7] The district court likewise recognized this automatic link. While it agreed that "the public's right to access information concerning potential chemical hazards in their communities" underlies several of EPCRA's provisions, the court noted that is not EPCRA's "only goal, and Congress did not pursue [it] to the nth degree." (Dist. Ct. MSJ Mem. Op. at 18, JA204) Together with CERCLA, EPCRA "establishes a framework of state, regional, and local agencies designed

CERCLA's emergency reporting structure and purpose by faithfully implementing this automatic linkage.

### C. Plaintiffs' Interpretation Ignores the Most Pertinent Legislative History.

The Supreme Court recently renounced efforts "to revive that old-time devotion to legislative history," underscoring that "statutory interpretation must focus on the text—or, to borrow from Justice Robert Jackson, why interpretation must be driven by 'analysis of the statute' rather than 'psychoanalysis of Congress.'" *FS Credit*, 608 U.S. ___, 2026 WL 1686059, at *9. Here, the 2019 Rule is firmly anchored in the best reading of EPCRA's text, so there is no need to resort to history. *Cf. Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) ("[O]nce [Congress] enacts a statute, we do not inquire what the legislature meant; we ask only what the statute means.") (internal quotation marks and citation omitted). But if this Court wishes to examine EPCRA's history, that history reinforces EPA's conclusion that releases exempt from CERCLA reporting under the FARM Act need not be reported under EPCRA section 304.

"The classic criticism of using legislative history is that it is 'the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.'" *FS Credit*, 608 U.S. ___, 2026 WL 1686059, at *8. "True to form, [Plaintiffs] navigate[] around unwelcome guests." *Id.* Plaintiffs never even

. . . to provide for *emergency response* in the event of health-threatening release." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86 (1998)).

mention EPCRA's Conference Report, much less try to refute its characterization of section 304(a)(2). The report explains that Section 304(a) "establishes the requirement that emergency notice in the event of a release be provided to local emergency committees and the State *in three specific instances*." H.R. Conf. Rep. No. 99-962, 284, *reprinted in* 1986 U.S.C.C.A.N. 3276, 3377 (emphasis added). It then walks through the three specific instances in Sections 304(a)(1)-(3). Section 304(a)(2), the only "specific instance" at issue in this case, "requires notification where there is a release of an extremely hazardous substance that would require notice under section 103(a) of CERCLA *but for the fact that the substance is not specifically listed under CERCLA as requiring such notice*." *Id.* (emphasis added); *see also* EPA Br. at 24, 28 (summarizing Conference Report).

Plaintiffs' lone reference to EPCRA's legislative history is a statement by Representative Edgar, but that is no match for the Conference Report. *See* Pls' Opening Br. at 32. Plaintiffs zero in on Representative Edgar's view of how EPCRA's "reporting requirements should be construed to allow the public the broadest possible access to toxic chemical information[.]" *Id.* (quoting 132 Cong. Rec. H9561-03) (emphasis removed). That statement, however, comes from Representative Edgar's discussion of EPCRA Subchapter II ("Reporting Requirements"), *not* EPCRA Subchapter I ("Emergency Planning and Notification"), which contains the emergency notification provision at issue here. Immediately following the prefatory comments that Plaintiffs quote, Representative Edgar provided a detailed discussion about EPCRA Sections 311

to 313, which cover more general reporting requirements not at issue. *Id.* And as the Conference Report makes clear, those general reporting requirements "cover[] releases that occur as a result of normal business operations, as distinct from abnormal, emergency releases which must be reported under section 304." H.R. Conf. Rep. No. 99-962, 292, *reprinted in* 1986 U.S.C.C.A.N. 3276, 3385.

In sum, EPCRA's history, to the extent it is relevant, firmly supports EPA's interpretation in the 2019 Rule and cuts sharply against Plaintiffs.

### III. The FARM Act's Inconclusive History Does Not Undermine EPA's Consistent, Longstanding Interpretation That CERCLA Reporting Exemptions Create Parallel EPCRA Exemptions.

Citing a trio of decades-old cases for the proposition that subsequent legislative history carries weight in construing an earlier statute, Plaintiffs insist the 2019 Rule runs contrary to the 2018 FARM Act's history. *See* Pls' Opening Br. at 32-35. Plaintiffs are wrong on both the law and their characterization of the FARM Act's history.

By now, it is well established that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Marvin M. Brandt*, 572 U.S. at 109 (quotation marks and citation omitted); *see also Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring) ("Arguments based on subsequent legislative history, like arguments based on antecedent futurity, should not be taken seriously, not even in a footnote."). Stating the obvious, none of the views expressed during debate over the 2018 FARM Act are "contemporaneous construction[s] of a statute by [those] charged with the

responsibility of setting its machinery in motion." *Aluminum Co. v. Central Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 390 (1984) (internal quotation marks and citation omitted).

Plaintiffs first rely on floor statements from Senator Carper. *See* Pls' Opening Br. at 33-34. But Plaintiffs' theory that those statements somehow demonstrate that members of Congress intended to leave EPCRA reporting requirements "intact" "depends on the fictional premise that hundreds of legislators (not to mention the President) shared a unified private view of how the statute should apply in a contested circumstance." *FS Credit*, 608 U.S. ___, 2026 WL 1686059, at *7. More to the point, what Senator Carper thought is irrelevant; "rather than trying to unearth Congress's 'actual intent,' . . . courts look for 'objectified intent'—the intent that a reasonable person would gather from the text of the law. . . . Put differently: The judicial task is to read words, not minds." *Id.* n.5.

Similarly, the Congressional Research Service ("CRS") findings and witness testimony that Plaintiffs cite (Pls' Opening Br. at 34-35) carry zero weight and "should not be taken seriously, not even in a footnote." *Sullivan*, 496 U.S. at 632 (Scalia, J., concurring). Plaintiffs overstate the significance of CRS's findings, claiming that CRS understood the FARM Act "would not create an exemption from EPCRA." Pls' Opening Br. at 34. In fact, CRS found the FARM Act *would* automatically have an impact on EPCRA. In its initial memorandum, which Plaintiffs do not quote, CRS stated: "S. 2421 would not amend EPCRA.

However, exempting releases of hazardous substances in air emissions from animal waste at farms from reporting under Section 103 of CERCLA would have the effect of exempting such releases from reporting to state and local officials under Section 304(a)(1) and Section 304(a)(3) of EPCRA." S. Hrg. 115-237, at 75 (Mar. 8, 2018), JA232. CRS then stopped short of concluding whether the FARM Act would also have the effect of exempting such releases from reporting under Section 304(a)(2). *See id.* In a second memorandum, which is what Plaintiffs quote from (at 34), CRS said that "[a]n air release of an extremely hazardous substance emitted by animal waste at a farm would be subject to Section 304(a)(2) if all three statutory criteria for reporting were met. . . . The applicability of this provision [(a)(2)] to a particular release *would depend on whether all three statutory criteria outlined above are met*." *Id.* at 78-79, JA235-36 (emphasis added). In other words, CRS merely equivocated about the interplay between the FARM Act and EPCRA Section 304(a)(2). CRS never concluded that the releases at issue require EPCRA notification.

In the end, if this Court considers legislative history, all that matters is how the 1986 Congress understood the interplay between CERCLA's and EPCRA's emergency notification provisions. That understanding is clear from the 1986 Conference Report, which cannot be overcome by contrary views from individual legislators over thirty years later who were charged with knowledge of that understanding (and with knowledge of EPA's longstanding interpretation of the same). *See Ctr. for Auto Safety v. Skinner*, 936 F.2d 1315, 1316 (D.C. Cir. 1991)

(internal quotation marks and citation omitted) ("Congress must be presumed to have known of its former legislation . . . and to have passed the new laws in view of the provisions of the legislation already enacted."); *see also Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change" or "adopts a new law incorporating sections of a prior law[.]").

## CONCLUSION

The 2019 Rule correctly implements EPCRA's plain text, structure, and history. This Court should affirm.

Dated: July 30, 2026

Respectfully submitted,

*/s/ David Y. Chung*

David Y. Chung
HOLLAND & HART LLP
505 Ninth Street, NW
Suite 700
Washington, DC 20004
Phone: (202) 654-6919
dychung@hollandhart.com

*Counsel for Intervenor-Defendants-Appellees*

*Of counsel*:
Michael C. Formica
National Pork Producers Council
122 C Street, NW
Suite 875
Washington, DC 20001

Travis Cushman
American Farm Bureau Federation
600 Maryland Avenue, SW
Suite 1000
Washington, DC 20024

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 28(a)(10), I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 8,047 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) as it has been prepared in Microsoft Word 365 using 14-point Times New Roman typeface and is double-spaced (except for headings, footnotes, and block quotations).

Dated: July 30, 2026

*/s/ David Y. Chung*
David Y. Chung

*Counsel for Intervenor-Defendants-Appellees*